44 P.3d 1100

Ray E. INFANGER and Vera S. Infanger, husband and wife, Plaintiffs–Appellants–Cross Respondents,

v.

The CITY OF SALMON, The City Council of the City of Salmon, Defendants–Respondents–Cross Appellants,

and

Charles E. Bender and Denise Bender, husband and wife, Defendants–Respondents.

No. 25843.

Supreme Court of Idaho,
Idaho Falls, May 2001 Term.

Jan. 17, 2002.

Rehearing Denied April 12, 2002.

Jim Jones & Associates, Boise, for appellants. Jim Jones argued.

Holden, Kidwell, Hahn & Crapo, PLLC, Idaho Falls, for respondents-cross appellants City of Salmon. Dale W. Storer argued.

Milton A. Slavin, Salmon, for respondents Charles and Denise Bender.

EISMANN, Justice.

Ray and Vera Infanger appeal from summary judgment entered against them in their action challenging the vacation of a city street.

## I. FACTS AND PROCEDURAL HISTORY

William Guth owned Lots 6 and 7 in Block 8 of the Shoup Subdivision in the City of Salmon, Idaho. On September 1, 1993, he sold Lots 6 and 7 to Simon and Susan Bowland (herein "Bowlands"), who executed a deed of trust to secure their payment of the purchase price. Lots 6 and 7 were adjoining lots, and they were bordered on the south by a platted but unimproved city street. The Bowlands also owned Block 10, a small, trian-

gular piece of land located immediately south of the unimproved street.

In the fall of 1985, the City and the Bowlands began discussions about the City vacating Edwards Street and acquiring from Bowlands the eastern half of Block 10 in order to reconfigure a hazardous intersection at the eastern end of that block. As the discussions proceeded, the City proposed exchanging Edwards Street for the eastern half of Block 10.

On April 7, 1986, the City Council voted to proceed with the proposed land exchange. The City drafted Ordinance No. 494–86 (herein "Ordinance") and published notice of a public hearing on the Ordinance and the City's intent to exchange the parcels of land. The public hearing was held on May 5, 1986, and the City Council adopted the Ordinance at the close of the hearing. The Ordinance stated that the City intended to exchange that portion of the unimproved street located south of Lots 6 and 7 (herein "Edwards Street") for the eastern half of Block 10 owned by the Bowlands. On March 31, 1987, the City quitclaimed Edwards Street to the Bowlands, and they quitclaimed the eastern half of Block 10 to the City.

In early 1988 the Bowlands defaulted in making the payments due on Lots 6 and 7, and on July 5, 1988, Mr. Guth regained title to the lots through a non-judicial foreclosure of the deed of trust. On December 16, 1988, Guth sold Lots 6 and 7 to Ray and Vera Infanger (herein "Infangers"), who still own that property.

On November 23, 1993, the Bowlands sold Edwards Street and the remainder of Block 10 to Charles and Denise Bender (herein "Benders"). The Benders own Lots 4 and 5 of Block 8, which are located immediately west of Lots 6 & 7. They have a warehouse on Lots 4 and 5, and in 1995 they constructed on Edwards Street an addition to the warehouse and a concrete loading ramp. The ramp was built along the northern edge of Edwards Street, blocking Infangers' access to Edwards Street through the rear door of their building.

The Infangers commenced this action on June 28, 1996. They alleged in their com-

plaint that the Ordinance was invalid, that they had an easement to use Edwards Street, that title to Edwards Street should be quieted in them, and that they had been damaged by the actions of the City and the Benders. The City answered and alleged various defenses including the statute of limitations, waiver and estoppel. The Benders also answered and asserted the same defenses that were alleged by the City. The Infangers also named the Bowlands as defendants, alleging that they may claim some interest in Edwards Street. The Bowlands were later dismissed by agreement of the parties.

The City and the Infangers each filed a motion for summary judgment. The City contended that the Infangers were not damaged by any action of the City; that as a matter of law the Infangers did not have a claim for damages against the City; that the Infangers had no standing to assert a claim for damages against the City; that any claim of the Infangers for liability created by statute or trespass was barred by the statute of limitations; that the Infangers' challenge to the Ordinance was not timely under Idaho Code § 50–1323; and that when enacting the Ordinance the City complied with Idaho Code §§ 50–311 and 50–1321. The Infangers countered the arguments made by the City and contended that the Ordinance was an invalid exchange of a city street for other property rather than the vacation of a city street. The district court characterized the Ordinance as the vacation of Edwards Street and granted partial summary judgment in favor of the City. It held that when enacting the Ordinance, the City had substantially complied with the statutory requirements for vacating a city street.

The district court then tried the issue of the Infangers' claimed easement, and concluded that they did not have an easement on Edwards Street. The Infangers appealed the grant of partial summary judgment, and the City cross-appealed alleging that the statute of limitations barred the Infangers from challenging the validity of the Ordinance.

## II. STANDARD OF REVIEW

In an appeal from an order of summary judgment, this Court's standard of review is

the same as the standard used by the trial court in ruling on a motion for summary judgment. *Eagle Water Company, Inc. v. Roundy Pole Fence Company, Inc.*, 134 Idaho 626, 7 P.3d 1103 (2000). All disputed facts are to be construed liberally in favor of the non-moving party, and all reasonable inferences that can be drawn from the record are to be drawn in favor of the non-moving party. *Id.* Summary judgment is appropriate if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Id.* If there is no genuine issue of material fact, only a question of law remains, over which this Court exercises free review. *Post v. Idaho Farmway, Inc.*, 135 Idaho 475, 20 P.3d 11 (2001).

### III. ANALYSIS

■ The district court characterized the Ordinance as vacating Edwards Street. It is clear from the record, however, that the City did not vacate Edwards Street. Rather, it attempted to exchange Edwards Street for a parcel of land owned by the Bowlands. The validity of the Ordinance must be based upon what the City actually did, not what, in hindsight, it wishes it would have done.

The City Council minutes of October 7, 1985, reflect that Mr. Bowland initially asked the City Council to vacate Edwards Street. The minutes of the meeting show the following:

> Simon Bowland appeared before the Council to request the City to vacate that portion of Edwards St. that bisects his property on S. Daisy and Union Avenue. Motion by Jack Nelson, seconded by Stan Davis: The City Attorney to present the Council with the proper procedures necessary to vacate a public right-of-way and the City send a letter to the adjoining property owners of this request from Mr. Bowland. Motion passed 5 ayes 0 nayes.

The City Council discussed the matter again at its meeting on February 18, 1986. Again, it referred to the matter as the vacation of Edwards Street. The minutes reflect the following:

> Motion by Stan Davis, seconded by Denny Hawley: Authorization be given to the City Engineer to proceed with the evacuation [sic] of a portion of Edwards Street and the reconstruction of S. Daisy Street in order to straighten the latter. The Public Works Committee shall meet February 25, 1996 at 5:30 p.m. to consider the recommendation from the Planning and Zoning Commission to rename specific streets.

By April 7, 1986, however, the transaction was characterized as a land exchange rather than a street vacation. The minutes of that meeting reflect the following:

> Motion by Stanley Davis, seconded by Luke Prange: The City proceed with the land exchanges of properties adjoining Mulkey Street and Union Street as presented by the City Engineer. Motion passed unanimously.

> Mayor Nelson directed the City Attorney to prepare the necessary City Ordinance for the land exchanges. He further directed the City Engineer to continue the survey and other technicalities for the land exchange.

The Ordinance was then drafted. It was drafted as a land exchange, not as a street vacation. The ordinance provided as follows:

ORDINANCE NO. *494–86*

AN ORDINANCE PROVIDING FOR THE EXCHANGE OF A PARCEL OF REAL PROPERTY OWNED BY THE CITY OF SALMON, IDAHO FOR OTHER REAL PROPERTY OWNED BY SIMON J. BOWLAND AND SUSAN N. BOWLAND, HUSBAND AND WIFE, PURSUANT TO THE PROVISIONS OF TITLE 50, CHAPTER 14, IDAHO CODE; PARTICULARLY DESCRIBING SAID PARCEL; PROVIDING FOR A PUBLIC HEARING PRIOR TO SAID SALE; SETTING FORTH A DATE AFTER WHICH SAID EXCHANGE MAY BE MADE; AND PROVIDING WHEN THE ORDINANCE SHALL BECOME EFFECTIVE.

Be it ordained by the Mayor and the City Council of the City of Salmon, Idaho:

*Section 1.* The Mayor and Council of the City of Salmon hereby express their intent to exchange certain real property, more particularly described as follows:

[legal description of Edwards Street]

for certain real property presently owned by SIMON J. BOWLAND and SUSAN N. BOWLAND, husband and wife, more particularly described as follows:

[legal description of eastern
portion of Block 10]

*Section 2.* Should a petition expressing dissatisfaction with the above exchange and containing the names of qualified electors of the City of Salmon in a number equal to ten percent (10%) of the total votes cast for mayor at the preceding City election, be filed with the City Clerk within sixty (60) days after passage of this Ordinance, the City Council shall cause a special election to be held on the question of whether or not the above described real property belonging to the City should be exchanged. If such an election is called, the assent of a majority of the qualified electors voting on the question shall be required to authorize the exchanges of real property as set forth herein.

*Section 3.* That Tuesday, the *5th* day of *MAY,* 1986 at the hour of 7:30 o'clock p.m. at the City Hall in Salmon, Idaho, are hereby set as the time and place for a public hearing on the question of whether or not the above described real property belonging to the City of Salmon should be exchanged as set forth in this Ordinance.

*Section 4.* This Ordinance shall be in full force and effect from and after its passage, approval and publication according to law.

The first reading of the ordinance was at the City Council meeting on April 21, 1986. The minutes of that meeting reflect the following:

Motion by Stan Davis, seconded by Patricia Hauff: The first reading of proposed *ORDINANCE # 494–86* be approved and the legal notice for a public hearing on May 5, 1986 by published.

*Land Exchange on Union and South Daisy.* Motion passed unanimously.

Notice of the public hearing was published on May 1, 1986. The notice stated that the proposed Ordinance was a land exchange, not the vacation of a public street. The published notice stated as follows:

NOTICE OF PUBLIC HEARING ON PROPOSED ORDINANCE # 494–86: THE INTENT TO EXCHANGE LAND ON UNION AND S. DAISY STREET IN ORDER TO DECREASE THE DANGERS OF THE INTERSECTION.

The City Council will hold a public hearing in City Hall, 200 Main Street, Salmon, Idaho on May 5, 1986 at 7:30 p.m. during the regular Council meeting for the purpose of obtaining written and oral comments from the public regarding the exchange of property.

All interested residents are encouraged to attend the hearing. Persons attending the meeting shall have the right to provide oral or written comments and/or suggestions on said exchange of property.

The public hearing was held at the beginning of the City Council meeting on May 5, 1986. Again, the transaction was called a land exchange, not the vacation of a public street. The minutes reflect that the following occurred:

Mayor Nelson opened the Public Hearing on proposed *Ordinance # 494–86:* Pertaining to an exchange of land between the City of Salmon and Simon Bowland that involved S. Daisy and Edward Streets. Mayor Nelson asked City Engineer Frazee to present the details of the exchange and the benefits to the City. The City Engineer pointed out that with the exchange that S. Daisy could be straightened and have less traffic hazards than the dog-leg now creates.

Mayor Nelson asked if any one in the audience had any comments or questions. Hearing none, Mayor Nelson asked if any member of the Council had questions or comments. Hearing none, Mayor Nelson declared the Public Hearing closed.

Later in the meeting, the City Council voted unanimously in favor of the Ordinance.

There is a clear distinction between a city vacating a city street and a city exchanging a portion of a city street for other property. The vacation of a city street is governed by Idaho Code § 50–311 and, if the street is part of a plat or subdivided tract, by Idaho Code § 50–1321. The exchange of city real property for other property is governed by Idaho Code § 50–1403. Idaho Code § 50–1403 does not apply to the vacation of a city street.[1] The Ordinance was drafted as an exchange of real property under Idaho Code § 50–1403 rather than as a vacation of a city street under Idaho Code §§ 50–311 and 50–1321.

At least seven times in the Ordinance, the transaction is called an exchange of real property. It is never called the vacation of a city street. The title to the Ordinance states that it was made "pursuant to the provisions of Title 50, Chapter 14, Idaho Code." Chapter 14 of Title 50 governs the sale, conveyance, or exchange of real property by a city. Chapters 3 and 13 of Title 50 would have governed the vacation of Edwards Street. The Ordinance itself states that the intent of the mayor and city council is to exchange Edwards Street for certain real property owned by the Bowlands. Finally, Section 2 provides that the exchange of properties can be challenged by a special election. That provision was obviously included to comply with Idaho Code § 50–1403,[2] which establishes the identical means for challenging the sale, conveyance, or exchange of city property. Neither Idaho Code § 50–311 nor § 50–

1321 authorizes a special election to challenge an ordinance vacating a city street.

The Ordinance was clearly an attempt by the City to exchange Edwards Street for the eastern portion of Block 10 owned by the Bowlands. Under Idaho law, however, a city has no authority to convey a portion of a city street. In Idaho, city streets from side to side and end to end belong to the public and are held by the municipality in trust for the use of the public. *Kleiber v. City of Idaho Falls*, 110 Idaho 501, 716 P.2d 1273 (1986); *Keyser v. City of Boise*, 30 Idaho 440, 165 P. 1121 (1917). In the absence of a statute expressly permitting it to do so, a city may not make a valid contract permanently alienating a part of a city street or permitting a permanent encroachment and obstruction thereon limiting the use of the street by the public. *Barton v. State*, 104 Idaho 338, 659 P.2d 92 (1983); *State v. Idaho Power Co.*, 81 Idaho 487, 346 P.2d 596 (1959); *Boise City v. Sinsel*, 72 Idaho 329, 241 P.2d 173 (1952). There is no statute in Idaho permitting a city to convey all or a portion of a city street. Thus, the City had no power to do what it attempted to do by enacting the Ordinance at issue here.

The City argues in its cross-appeal that the district court erred in holding that the Infangers' challenge to the Ordinance was timely under Idaho Code § 50–1323. As stated above, however, that statute applies to the vacation of a city street, not to the ex-

---

1. Idaho Code § 50–1409 provides, insofar as is relevant, "The provisions of sections 50–1401 through 50–1409 shall not apply to the vacation or discontinuance of streets, highways, avenues, alleys or lanes annulled, vacated or discontinued."

2. The statute, as it existed in 1986, provided as follows:

Real property belonging to a city shall not be sold, conveyed or exchanged except by ordinance duly passed expressing an intent to sell, convey or exchange, nor until public hearing is held before the city council. The ordinance expressing an intent to sell, convey or exchange real property shall specifically describe the property to be sold, conveyed or exchanged. No sale, conveyance or exchange of real property as set forth in said ordinance shall occur until sixty (60) days have expired from the date of passage of said ordinance. If a petition expressing dissatisfaction with said sale, conveyance or exchange of real property, containing the names of qualified electors of the city in a number equal to ten percent (10%) of the total votes cast for mayor at the preceding city election, is filed with the city clerk during said sixty (60) days, the city council shall cause a special election to be held on the question of whether or not the real property shall be sold, conveyed or exchanged. If a majority of the qualified electors voting on the question are in favor, the real property may be sold, conveyed or exchanged. If a majority of the qualified electors voting on the question are not in favor, the real property may not be sold, conveyed or exchanged, and the city council may not again propose to sell the same property for at least six (6) months following the date of the special election.

Ch. 10, § 1, 1967 Idaho Sess. Laws (1st extraordinary sess.) 36, 37.

change of a portion of a city street for other property. There is no statute of limitations that applies in cases in which a city unlawfully attempts to convey a portion of a city street. *Boise City v. Wilkinson*, 16 Idaho 150, 102 P. 148 (1909). Equitable estoppel may apply, however. *Id.* The City may be estopped from reopening the street, *Id.*, and the Infangers may be estopped from challenging the Ordinance. *Canady v. Coeur d'Alene Lumber Co.*, 21 Idaho 77, 120 P. 830 (1911). The City argued that the Infangers were estopped from challenging the Ordinance, but the district court did not rule on that issue, and we express no opinion as to whether the facts in this case are sufficient to raise the issue of estoppel. The facts regarding that issue are in dispute. In his affidavit filed in this action, Guth stated that he had no knowledge of any change in ownership of Edwards Street until after the Benders began construction of the loading dock in 1995. Mr. Infanger testified that he first learned of the vacation of Edwards Street in 1995 when he contacted the City after learning that the Benders intended to build the loading ramp. In his affidavit, however, Mr. Bowland stated that in 1989 Mr. Infanger contacted him regarding purchasing Edwards Street. Therefore, this case must be remanded.

## IV. CONCLUSION

The Ordinance enacted by the City was void because it was an attempt to convey a portion of a city street. We reverse the order of the district court holding that the Ordinance constituted a valid vacation of a city street. Because there are other issues that must be resolved, we remand this case for further proceedings consistent with this opinion.

Costs are awarded to the appellants.

Chief Justice TROUT, and Justice WALTERS CONCUR.

Justice KIDWELL, dissenting.

Because the facts in this case clearly demonstrate that the Infangers should be estopped from challenging the validity of the vacation ordinance and the resulting land transactions, I respectfully dissent.

The respondents correctly urge that the appellants should be estopped from challenging the validity of the vacation ordinance because they are the successors in interest to the Bowlands, who were the beneficiaries of the ordinance. The respondents have not asserted that the Infangers or the Bowlands ever made misrepresentations; rather, they argue that the Infangers cannot be allowed to reap the benefits of assuming a position contrary to that of their predecessors in interest. In essence, the respondents seek application of a form of equitable estoppel known as quasi-estoppel, rather than common, reliance-based equitable estoppel. *See Lunders v. Estate of Snyder*, 131 Idaho 689, 695, 963 P.2d 372, 378 (1998).

### A. The Bowlands Would Be Estopped From Challenging The Validity Of The Vacation Ordinance.

As this Court has explained,

The doctrine of quasi-estoppel has its basis in acceptance of benefits; it precludes a party from asserting to another's disadvantage a right inconsistent with a position previously taken by him or her. The doctrine applies where it would be unconscionable to allow a person to maintain a position inconsistent with one in which he acquiesced or of which he accepted a benefit.

*Mitchell v. Zilog, Inc.*, 125 Idaho 709, 715, 874 P.2d 520, 526 (1994).

"Quasi estoppel, unlike equitable estoppel, does not require misrepresentation by one party or actual reliance by the other." *Lunders*, 131 Idaho at 695, 963 P.2d at 378; *see also, e.g., Willig v. State Dep't of Health & Welfare*, 127 Idaho 259, 261, 899 P.2d 969, 971 (1995). However, to apply the doctrine of quasi-estoppel in the absence of reliance, it must be shown that "the act of the party against whom the estoppel is sought must have gained some advantage to himself or produced some disadvantage to another." *Tommerup v. Albertson's, Inc.*, 101 Idaho 1, 7, 607 P.2d 1055, 1061 (1980); *see also KTVB, Inc. v. Boise City*, 94 Idaho 279, 281, 486 P.2d 992, 994 (1971).

In applying the doctrine of quasi-estoppel, this Court must weigh the equities of the particular case at hand, considering all the circumstances presented, rather than engage in the application of strict standards or of strained analogies to the facts of prior estoppel decisions. *See Williams Lake Lands, Inc. v. LeMoyne Dev., Inc.,* 108 Idaho 826, 830, 702 P.2d 864, 868 (1985) ("Because quasi-estoppel is an equitable doctrine, its application depends upon a case by case analysis of the equities involved, rather than upon precise definitional standards."); *KTVB, Inc.,* 94 Idaho at 282, 486 P.2d at 995 ("[T]he essence of the proper application of the doctrine of quasi estoppel is the focus of the Court's attention upon the specific facts and circumstances of the case at bar.").

Here, the inquiry should begin with determining whether the Bowlands, the predecessors in interest to the Infangers, gained some advantage for themselves in soliciting and supporting the City's decision to vacate the Edwards Street property and in subsequently accepting the validity of the vacation ordinance once it was adopted.

Assuming that the street was properly vacated, the effect was to incorporate one half of the width of the vacated street into the abutting properties on each side. *See* I.C. § 50–3011; *Carney v. Heinson,* 133 Idaho 275, 278, 985 P.2d 1137, 1140 (1999). Thus, the Bowlands, in their capacities as owners of Lots 6 and 7, received the benefits of the vacation ordinance. Specifically, the Bowlands received a substantial enhancement in the value of Lots 6 and 7, as was testified to by Mr. Bowland, and an increase in potential uses to which the lots could be put, due to their increased size. Additionally, the Bowlands suggested the vacation of Edwards Street to the City, acquiesced in the City's passage of an ordinance aimed at vacation, and accepted the City's conveyance of the property. Consequently, the Bowlands received a benefit from their encouragement of and acquiescence in the vacation ordinance, and a later challenge to that same ordinance would most surely be inconsistent with their prior position.

Next, the inquiry should turn to whether it would be unconscionable to allow this challenge. Notably, the record indicates that the Infangers failed to voice any objection to the Benders' construction of a $121,000 structure on the Edwards Street property until approximately one year after it was completed. They acquiesced without comment as the Benders constructed an expensive building on property the Infangers now claim to be their own. While it is unnecessary to reach the issue of whether the Infangers are estopped by their own inequitable conduct, their acquiescence warrants mention in this equitable analysis, because it makes the situation unconscionable from the Benders' perspective, regardless of whether it was the predecessor or successor who encouraged the City to vacate the street.

The Benders have expended over $121,000 and constructed a permanent structure on the contested portion of the vacated street as an ultimate result of the vacation ordinance in which the Bowlands acquiesced. It would be unconscionable to allow this challenge to the ordinance, the validity of which went unchallenged for nearly ten years, and the creation of which was encouraged by the Bowlands. To do so could result in the Benders being thrust into the position of owning an expensive structure, the construction of which was acquiesced in by the party challenging their ownership of the property, situated on land for which they have paid consideration, but do not own. The Bowlands would be estopped if they were the party attempting to challenge the vacation ordinance.

**B. The Infangers Should Be Estopped as Successors to the Bowlands.**

Among the Idaho cases in which successor estoppel has been a potential issue, few have squarely addressed the issue, because it was mooted by holdings on other issues, like failure of proof of inequitable conduct by the predecessors, *see, e.g., Sun Valley Hot Springs Ranch, Inc. v. Kelsey,* 131 Idaho 657, 662–63, 962 P.2d 1041, 1046–47 (1998); *Herrmann v. Woodell,* 107 Idaho 916, 922, 693 P.2d 1118, 1124 (Ct.App.1985), and failure of the party claiming estoppel to properly raise the issue in pleadings, *see, e.g., Argyle v.*

*Slemaker,* 107 Idaho 668, 669–70, 691 P.2d 1283, 1284–85 (Ct.App.1984).

The few cases that have addressed this issue have focused on the factually specific question of whether estoppel should run against a foreclosure sale purchaser of property based upon the actions of the prior owner. In a 1917 case this Court held, in part, that a successor may be estopped by the actions of a predecessor when the successor purchased the predecessor's interest at an execution sale and was not a bona fide purchaser without knowledge. *See Mountain Home Lumber Co. v. Swartwout,* 30 Idaho 559, 571, 166 P. 271, 274 (1917). In *Mountain Home Lumber,* Garrett, the predecessor in interest, sold a piece of land to a first purchaser. Two months later, Garrett purported to sell the same property to a second purchaser. These actions were sufficient to make Garrett the holder of an equitable trust in favor of the first purchaser, estopping Garrett from questioning the first purchaser's title. *Id.* at 570, 166 P. at 273–74. Subsequently, the appellant in the case obtained a civil judgment against Garrett, and believing him to still be the owner of the property in question, executed upon the property, purchasing the property at its own execution sale (foreclosure sale purchaser). This Court held that the foreclosure sale purchaser was not a bona fide purchaser as a matter of debtor/creditor law, and that, as a successor to Garret, the foreclosure sale purchaser was estopped to deny the validity of the title of the first purchaser. *Id.* at 571, 166 P. at 274. The Court reasoned that the successor could receive "only such title and interest as Garrett had, and must be said to have taken the legal title in trust for [the first purchaser], and subject to every element of estoppel that could be urged against Garrett." *Id.*

The holding in *Mountain Home Lumber* was cited in and bolstered by the holding in *Rexburg Lumber Co. v. Purrington,* 62 Idaho 461, 468, 113 P.2d 511, 513–14 (1941). In *Rexburg Lumber,* a judgment creditor foreclosed its lien on a debtor's property and then purchased the property at its own execution sale. Unknown to the purchasing creditor, the debtor's property was subject to

an equitable trust in favor of another party. After holding that the creditor could not be a bona fide purchaser as a matter of debtor/creditor law, this Court held that the creditor acquired only the title of the debtor and that its title was consequently subject to hidden equities against the debtor's title. *Id.* at 468–69, 113 P.2d at 513–14.

The holdings in *Mountain Home Lumber* and *Rexburg Lumber* addressed particular factual situations involving collateral issues of debtor/creditor law, but they were based on an underlying equitable principle that is equally applicable to the case at bar—equity will not allow a land possessor to be unconscionably injured by inequitable conduct simply because the perpetrator of the inequitable conduct transferred his or her tainted interests to another party.

This underlying principle is reflected in cases from other jurisdictions, which hold that successors in interest may be estopped by the actions of their predecessors, at least where the successor had notice of the facts giving rise to the estoppel. *See Evans v. Wittorff,* 869 S.W.2d 872, 875 (Mo.Ct.App. 1994); *Myers v. Key Bank, N.A.,* 113 A.D.2d 244, 495 N.Y.S.2d 755, 757 (N.Y.App.Div. 1985) *aff'd,* 68 N.Y.2d 744, 506 N.Y.S.2d 327, 497 N.E.2d 694 (1986); *"Moore" Burger, Inc. v. Phillips Petroleum Co.,* 492 S.W.2d 934, 939 (Tex.1972); *Bratt v. Peterson,* 31 Wis.2d 447, 143 N.W.2d 538, 542 (1966); *McCarthy v. Union Pac. Ry. Co.,* 58 Wyo. 308, 131 P.2d 326, 332 (1942).

Estoppel created by the actions of a predecessor in interest should be effective against a successor in interest, at least where the successor can be charged with knowledge of the facts giving rise to the estoppel.

Equitable considerations require the application of successor estoppel in the situation presented here. The Infangers can be charged with notice of all recordings regarding the disputed property, since "[e]very conveyance of real property acknowledged or proved, and certified, and recorded as prescribed by law, from the time it is filed with the recorder for record, is constructive notice of the contents thereof to subsequent purchasers and mortag(e)es." I.C. § 55–811. Consequently, they can be charged with no-

tice of the quitclaim deed to the Edwards Street property, filed by the City. Additionally, the Infangers demonstrated knowledge that they might not be the owners of the disputed property when, after purchasing Lots 6 and 7 from Guth in December of 1988, they inquired about buying the Edwards Street property from the Bowlands. Finally, the Infangers acquiesced without comment as the Benders constructed an expensive structure on the disputed property. It would be inequitable to allow a past land transaction to be undone by a successor when the successor had notice of the transaction and his predecessor's acquiescence in the transaction at the time he purchased the land. Consequently, the Infangers stand in the same position as their predecessor, the Bowlands, and should be estopped.

The application of successor estoppel is also necessary to preserve Idaho's public policy as represented in the above-quoted recording statute, I.C. § 55–811. To allow successors to challenge the validity of such transfers would subject real estate sales of this type to unending uncertainty and would effectively remove the efficacy of our recording systems as to this entire category of transactions.

Because the Infangers can be charged with notice of the facts giving rise to an estoppel against their predecessor, I express no opinion as to whether estoppel can run against successors in interest without notice.

### C. A Party May be Estopped to Challenge the Validity of an Ordinance Even if It Was Void On Its Face.

The Infangers assert that, even if successors in interest may generally be estopped due to the actions of their predecessors, a party cannot be estopped from challenging a statute or ordinance that was void when passed.

The Infangers rely heavily on this Court's decision in *Hillman v. City of Pocatello,* 74 Idaho 69, 72, 256 P.2d 1072, 1073 (1953). In *Hillman,* this Court carved out an exception to the rule "that one taking advantage of a statute cannot challenge its validity." *Id.* This Court held that the appellant could not be estopped from challenging an ordinance where it was later determined that the ordinance was void when it was passed. *Id.*

The holding of *Hillman,* however, was undermined by this Court's holding in *Alexander v. Trs. of Village of Middleton,* 92 Idaho 823, 452 P.2d 50 (1969). In that case, Alexander was appealing a decision of the district court that held that he and the other appellants were estopped from challenging the validity of a city's annexation ordinance because they had accepted the benefits of the ordinance and had delayed the assertion of their rights for a long period of time. *Id.* at 824, 452 P.2d at 51. In affirming the district court, this Court held "the language of *Hillman v. City of Pocatello,* supra, in precluding the imposition of equitable estoppel as a defense in this type of action, is erroneous." *Id.* at 827, 452 P.2d at 54. Thus, under the circumstances existing in the present case, estoppel can be used to bar one who challenges the validity of an ordinance that was void when passed.

The district court's grant of summary judgment should be affirmed on the alternative theory that the Infangers are estopped to challenge the validity of the vacation ordinance.

Justice SCHROEDER CONCURS.