# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 42634-2014

| | | |
|---|---|---|
| MELINDA DEITER and JOSEPH DEITER, individually, and as parents and natural guardians of MELINDA ROBERTS and GIDEON DEITER, minors, | ) ) ) ) ) | |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | Boise, February 2016 Term |
| DONALD COONS, SHARON COONS, and PENNY COONS dba DON'S MEATS, and PATTY A. ANDERSON, | ) ) ) ) | 2017 Opinion No. 41 Filed: May 1, 2017 |
| Defendants-Respondents, | ) ) | Stephen W. Kenyon, Clerk |
| and | ) ) | |
| JANAK, INC., and DONALD JANAK, | ) ) | |
| Defendants. | ) ) | |

Appeal from the District Court of the Third Judicial District of the State of Idaho, in and for Gem County. Hon. Juneal C. Kerrick, District Judge.

The judgment of the district court is <u>affirmed</u>.

Elliot L. Olsen, Pritzker Olsen, P.A., Minneapolis, Minnesota, argued for appellants.

Stanley J. Tharp, Eberle, Berlin, Kading, Turnbow & McKlveen, Chtd., Boise, argued for respondents Donald Coons, Sharon Coons, and Penny Coons.

Steven R. Kraft, Moore & Elia, LLP, Boise, argued for respondent Patty Anderson.

---

EISMANN, Justice.

This is an appeal out of Gem County from a judgment dismissing claims against the person who sold a steer for slaughter that was later contaminated with E. coli bacteria by the

1

slaughterer and against the persons to whom the slaughterer delivered the carcass for processing into packages of meat. We affirm the judgment of the district court.

## I.
## Factual Background.

Patty Anderson agreed to sell a 4-H steer for her eighteen-year-old granddaughter Danielle Bryant, who had purchased and raised the steer. Ms. Anderson placed an ad on Craigslist, and Joseph Deiter responded to the ad, but he only wanted to purchase one-half of the steer. He and Ms. Anderson communicated regarding various issues, and she ultimately prepared a handwritten contract ("Deiter Contract"), which they both signed. The contract provided:

> This is a contract iniated [sic] on Aug. 14, 2010 between Patty A. Anderson and Joseph and Melinda Deiter . . . Meridian, ID.
> A deposit of $100.00 (check # 1178) has been received by Patty A. Anderson for 1/2 of a beef in (carcass weight). Once the beef has been killed and delivered to Don's Meat in Emmett, ID, the carcass weight will be known and Sharon Coons (owner of Don's Meat) will tell us what that weight is. At that time Joseph and Melinda Deiter will pay me (Patty Anderson) the amount of $2.25 lb for 1/2 the beef. When the meat has been cut + wrapped by Don's Meat Joseph and Melinda Deiter will pay Sharon Coons 45¢ lb for that service and will pick up their half of the beef.

Once Mr. Deiter had paid the $100.00 deposit and returned the signed contract, Ms. Anderson then had to find someone who was willing to purchase the other half of the steer before it was slaughtered. She placed another ad on Craigslist seeking a purchaser for the other half of the steer. A Mrs. Kirk responded to that ad, paid a $100.00 deposit, and signed a handwritten contract dated August 17, 2010, that had been prepared by Ms. Anderson.

Ms. Anderson contacted Donald Janak, who along with his wife own Janak, Inc., a mobile slaughtering business. He was asked to slaughter the steer on behalf of Mr. Deiter and Mrs. Kirk and to deliver the carcass to Don's Meats, which was a custom meat processing business that was owned and operated by Donald and Sharon Coons and their daughter Penny Coons. Mr. Janak and an employee of Janak, Inc., went to Ms. Anderson's property, where Ms. Anderson's ex-husband delivered possession of the steer to Mr. Janak. Mr. Janak and the employee slaughtered and skinned the steer, cut the carcass in half down the middle, and delivered the two halves of the carcass to Don's Meats, where the meat was processed. Mr.

Deiter's half of the carcass was processed first, and then Mrs. Kirk's half of the carcass was processed. Ms. Anderson paid Mr. Janak's fee. Mr. Deiter and Mrs. Kirk informed Don's Meats how they each wanted their respective halves of the carcass butchered and wrapped, and they each picked up their respective quantities of cut-and-wrapped meat from Don's Meats. Each package of meat was marked "Not for Sale." After eating the meat, the members of the Deiter family became ill due to becoming infected with E. coli bacteria.

On January 9, 2012, the Deiters filed this action against Ms. Anderson, Mr. Janak and his corporation, and the Coonses. Ms. Anderson filed a motion for summary judgment as to the claims against her, and, after briefing and argument, the district court granted her motion. The Deiters filed a motion for reconsideration, but the court denied their motion. The Coonses moved for summary judgment as to the claims against them and, after briefing and argument, the district court granted their motion. The Deiters settled with Mr. Janak and Janak, Inc., and they appealed the judgment in favor of Ms. Anderson and the Coonses. After oral argument, this Court requested that the parties submit additional briefing on the issue of when title to the steer passed under the Uniform Commercial Code, and the parties did so.

## II.
### Did the District Court Err in Granting Summary Judgment to Ms. Anderson?

In their complaint, the Deiters alleged various theories of liability against Ms. Anderson, but the only theory they argue on appeal is that she was negligent per se for violating the Federal Meat Inspection Act, specifically 21 U.S.C. § 610(c). They argued to the district court that she violated the act because she sold adulterated meat; the steer was slaughtered under insanitary conditions; and she did not sell, slaughter, or prepare the steer for her own use. On appeal, the Deiters argue additional alleged violations of the Act that they contend would be a basis for a finding of negligence per se. Because those additional theories were not argued in the district court, we will not consider them on appeal. "An appellant is bound by the issues and theories upon which the case was tried below. Although a judgment may be sustained upon any legal theory, a new theory cannot be employed on appeal to attack the judgment." *Clements Farms, Inc. v. Ben Fish & Son*, 120 Idaho 185, 207, 814 P.2d 917, 939 (1991).

The Deiters argued to the district court that Mr. Anderson was negligent per se for violating section 610(c) of the Act, which provides:

3

No person, firm, or corporation shall, with respect to any cattle, sheep, swine, goats, horses, mules, or other equines, or any carcasses, parts of carcasses, meat or meat food products of any such animals—

. . . .

**(c) Sales, transportation, and other transactions**

sell, transport, offer for sale or transportation, or receive for transportation, in commerce, (1) any such articles which (A) are capable of use as human food and (B) are adulterated or misbranded at the time of such sale, transportation, offer for sale or transportation, or receipt for transportation; or (2) any articles required to be inspected under this subchapter unless they have been so inspected and passed . . .

In order to violate this provision, Ms. Anderson would have had to "sell, transport, offer for sale or transportation, or receive for transportation, [the described articles] in commerce." When initially enacted, the Act did not apply to intrastate transactions. The word "commerce" was defined to mean only interstate transactions. 21 U.S.C. § 601(h). The Act was later amended to permit the Secretary of Agriculture to designate a State as one in which the Act applies to operations and transactions wholly within the State if it has failed to develop or is not enforcing requirements equal to those imposed by the Act. 21 U.S.C. § 661(4)(c)(1). The Secretary designated Idaho as subject to the Act in 1981. *Designation of the State of Idaho under the Federal Meat Inspection Act*, 46 Fed. Reg. 28837-01 (May 29, 1981). Years later, the Idaho Legislature repealed Idaho's meat inspection laws. Ch. 94, § 1, 2006 Idaho Sess. Laws, 267, 267. Therefore, the district court erred in holding that the Act only applied to interstate transactions. "When the trial court reaches the correct result by an erroneous theory, we will affirm the result on the correct theory." *Stapleton v. Jack Cushman Drilling & Pump Co. Inc.*, 153 Idaho 735, 740, 291 P.3d 418, 423 (2012).

Ms. Anderson was acting as an agent for her granddaughter throughout these transactions. There is a factual dispute as to whether Mr. Deiter was so informed, but that dispute is immaterial. Being an agent of an undisclosed principal would make her liable on the contract, *Agrisource, Inc. v. Johnson*, 156 Idaho 903, 908, 332 P.3d 815, 820 (2014), but in this case it does not change the analysis with respect to liability.

Ms. Anderson was not liable because under the Idaho Uniform Commercial Code, title to the steer passed to Mr. Deiter and Mrs. Kirk when possession was transferred to Mr. Janak. The Deiters contend that they did not purchase the steer; they only purchased the meat that was to be derived from the steer. They argue that the contract uses the word "beef," which means the meat

4

from the steer, not the steer itself. The word "beef" can mean "the flesh of a cow, steer, or bull raised and killed for its meat" or "an adult cow, steer, or bull raised for its meat." Random House, Inc. http://www.dictionary.com/browse/beef (accessed: March 28, 2017). The Deiter Contract unambiguously used the word "beef" to mean an adult steer raised for meat.

The contract stated that Mr. Deiter purchased "1/2 of a beef in (carcass weight)." It was one-half of "*a* beef" that he contracted to purchase. (Emphasis added.) The use of the singular "a" indicates that he purchased one-half of an object. The contract then states, "Once the beef has been killed and delivered to Don's Meat in Emmett, ID, the carcass weight will be known . . . ." Only something living could be killed. The steer was living, the meat later derived from the carcass was not living and could not be killed. The words "the beef" could only refer to the "beef" in the preceding sentence, which is the one-half of a beef that Mr. Deiter contracted to purchase. Selling a live steer that is to be butchered and sold by carcass weight does not indicate that it is only the resulting processed meat that is being sold. Therefore, the contract unambiguously states that Mr. Deiter purchased one-half of the steer that was to be killed and that the purchase price was to be determined based upon the carcass weight of the steer after it was slaughtered and delivered to Don's Meats.

Idaho Code section 28-2-401(2) provides, insofar as is relevant, "Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods . . . ." There was no explicit agreement that title to the steer would pass at any time other than when Ms. Anderson completed her performance with reference to the physical delivery of the steer. Therefore, title passed when she completed that performance.

Idaho Code section 28-2-308(a) states that unless otherwise agreed "the place for delivery of goods is the seller's place of business or if he has none his residence." It is undisputed that Mr. Janak went to Ms. Anderson's residence where the steer was being held to take possession of the steer so he could slaughter it. Upon taking possession of the steer, Mr. Janak and the employee slaughtered it and then delivered the steer carcass to Don's Meats.

Under the Deiter Contract, it is clear that the carcass was to be delivered to Don's Meats. The contract states, "Once the beef has been killed and delivered to Don's Meat in Emmett, ID, the carcass weight will be known and Sharon Coons (owner of Don's Meat) will tell us what that weight is." Ms. Anderson instructed Mr. Janak that after he had slaughtered the steer, he was to

5

deliver the steer carcass to Don's Meats. Mr. Deiter and Mrs. Kirk became owners of the steer when Mr. Janak took possession of it. At that point Ms. Anderson had "complete[d] h[er] performance with reference to the physical delivery of the goods." I.C. § 28-2-401(2).

"Under the Uniform Commercial Code, there are two types of sales contracts when a carrier is used to transport the goods sold: (1) 'shipment' contracts; and (2) 'destination' contracts." 67 Am. Jur. 2d *Sales* § 479 (2014) (footnotes omitted). Idaho Code section 28-2-401 sets forth when title passes under shipment and destination contracts. It states:

> (a) if the contract requires or authorizes the seller to send the goods to the buyer but does not require him to deliver them at destination, title passes to the buyer at the time and place of shipment; but
> (b) if the contract requires delivery at destination, title passes on tender there.

I.C. § 28-2-401(2). Subsection (a) states when title passes for shipment contracts and subsection (b) states when title passes under destination contracts.

Under the shipment contract, the seller delivers the goods to a third party to transport the goods to the place required under the contract, and title passes when the goods are delivered to the person who will transport them. "The effect of the [Uniform Commercial] Code is that in the 'shipment' contract, the most commonly used method, delivery to the carrier is delivery to the buyer." 67 Am. Jur. 2d *Sales* § 480 (2014). "'A delivery by direction of the buyer to a third person as intermediary to ship the goods is a good delivery to the buyer.'" *Adams v. H & H Meat Products, Inc.*, 41 S.W.3d 762, 773 (Tex. App. 2001). Therefore, when Ms. Anderson delivered possession of the steer to Mr. Janak, who was then to slaughter it and transport the carcass to Don's Meats, title to the steer passed to Mr. Deiter and Mrs. Kirk.

"The 'shipment' contract is regarded as the normal one, and the 'destination' contract is regarded as the variant." 67 Am. Jur. 2d *Sales* § 479 (2014). If terms such as "F.O.B. the place of shipment" or "F.O.B. the place of destination" are not used in the contract "and there has been no specific agreement to the contrary, a contract for the transportation of goods by carrier will be presumed to be a 'shipment' contract." *Id*. Thus, the Deiter Contract is a shipment contract if the contract did not have a specific agreement making it a destination contract.

Idaho Code section 28-2-503 deals with the manner of the seller's tender of delivery. Subsection (2) of the statute refers to delivery under a shipment contract, and subsection (3) deals with delivery under a destination contract. The Official Comment to the statute provides some explanation as to the difference between the two. It states:

6

5. For the purposes of subsections (2) and (3) there is omitted from this Article [Chapter] the rule under prior uniform legislation that a term requiring the seller to pay the freight or cost of the transportation to the buyer is equivalent to an agreement by the seller to deliver to the buyer or at an agreed destination. *This omission is with the specific intention of negating the rule*, for under this Article [Chapter] the "shipment" contract is regarded as the normal one and the "destination" contract is the variant type. The seller is not obligated to deliver at a named destination and bear the concurrent risk of loss until arrival, *unless he has specifically agreed so to deliver* or the commercial understanding of the terms used by the parties contemplates such delivery.

(Emphases added.)

As stated in the comment, the prior uniform law provided that a contractual provision requiring the seller to pay the cost of transporting the goods to the buyer made the contract a destination contract, but the current version of the Uniform Commercial Code was specifically intended to negate that rule. Thus, the facts that Ms. Anderson paid Mr. Janak's fee and had him deliver the steer carcass to Don's Meats did not make this contract a destination contract. Likewise, a provision as to where the goods are to be shipped does not make the contract a destination contract. As stated in American Jurisprudence Second,

If the parties intend that delivery be made to a carrier, a request in the buyer's letter to the seller that the goods be shipped to the buyer's residence *is a mere shipping instruction that does not convert the contract to a destination contract*, and the risk of loss passes to the buyer at the time the goods are delivered to a carrier, such as the postal service.

67 Am. Jur. 2d *Sales* § 480 (2014) (emphasis added).

"Thus a 'ship to' term has no significance in determining whether a contract is a shipment or destination contract for risk of loss purposes. Other buyers have occasionally argued that the 'ship to' term made the contract into a destination contract. Courts have properly rejected this argument." *Eberhard Mfg. Co. v. Brown*, 232 N.W.2d 378, 380 (Mich. App. 1975). Likewise:

A "send to" or "ship to" term is a part of every contract involving the sale of goods where carriage is contemplated and has no significance in determining whether the contract is a shipment or destination contract for risk of loss purposes. As such, the "send to" term contained in this contract cannot, without more, convert this into a destination contract.

*Pestana v. Karinol Corp*., 367 So. 2d 1096, 1100 (Fla. Dist. Ct. App. 1979) (citations omitted).

7

The Deiter Contract did not expressly require Ms. Anderson to deliver the steer or the steer carcass to any place. "The parties must explicitly agree to a destination contract; otherwise the contract will be considered a shipment contract." *Id*. at 1099. There was nothing in the contract regarding risk of loss if the carcass was taken to the wrong place. The contract stated, "Once the beef has been killed and delivered to Don's Meat in Emmett, ID, the carcass weight will be known and Sharon Coons (owner of Don's Meat) will tell us what that weight is." The contract certainly contemplated that the steer carcass would be delivered to Don's Meats, but it did not state who was to deliver it, nor did it include any provision regarding the risk of loss if it was not delivered to Don's Meats.

Because the contract in this case was a shipment contract, title passed to Mr. Deiter and Mrs. Kirk at the time and place that Ms. Anderson completed her performance with reference to the physical delivery of the goods. I.C. § 28-2-401(2). Once possession of the steer was delivered to Mr. Janak, there was nothing more for Ms. Anderson to do under the contract with respect to the physical delivery of the goods. She thereafter never had possession of the steer or its carcass. She had completed all that she was to do.

Mr. Janak had agreed to transport the carcass to Don's Meats, where the Deiters were to pick up their portion of the meat after it was processed. As the contract stated, "When the meat has been cut + wrapped by Don's Meat Joseph and Melinda Deiter will pay Sharon Coons 45¢ lb for that service and will pick up *their half* of the beef." (Emphasis added.) Once Ms. Anderson delivered possession of the steer to Mr. Janak, Mr. Deiter became the owner of a one-half interest in the steer, and Mrs. Kirk became the owner of the other one-half interest.

The Deiters argued in the district court that Ms. Anderson was not exempt from the provisions of the Federal Meat Inspection Act because she did not sell, slaughter, or prepare the steer for her own use. She did not sell, slaughter, or prepare the meat. She sold a steer, and when it was slaughtered and the carcass prepared, Mr. Deiter and Ms. Kirk were the owners of the steer and its carcass.

The Deiters argued to the district court that Ms. Anderson violated the Federal Meat Inspection Act because she sold or offered for sale, in commerce, articles which were capable for use as human food and which were adulterated at the time of the sale or offer for sale as proscribed by 21 U.S.C. § 610(c). The steer was not "capable of use as human food" as that term is used 21 U.S.C. § 610(c). That term does not apply to a live animal. It would have to be "any

8

carcass, or part or product of a carcass, of any livestock." 9 CFR § 301.2(l). It was also not adulterated at the time of the sale.

Finally, the Deiters argued in the district court that Ms. Anderson violated the Federal Meat Inspection Act because the steer was slaughtered under insanitary conditions. A carcass would be adulterated under the Act if the steer was slaughtered in insanitary conditions. 21 U.S. Code § 601(l) & (m)(4). However, she was not the owner of the steer when that occurred.

When reviewing on appeal the granting of a motion for summary judgment, we apply the same standard used by the trial court in ruling on the motion. *Infanger v. City of Salmon*, 137 Idaho 45, 46–47, 44 P.3d 1100, 1101–02 (2002). We construe all disputed facts, and draw all reasonable inferences from the record, in favor of the non-moving party. *Id*. at 47, 44 P.3d at 1102. Summary judgment is appropriate only if the evidence in the record and any admissions show that there is no genuine issue of any material fact regarding the issues raised in the pleadings and that the moving party is entitled to judgment as a matter of law. *Id*.

We uphold the judgment of the district court dismissing this action as to Ms. Anderson. The Deiters have not shown that there was any genuine issue of material fact regarding their claim that she was negligent per se for violating provisions of the Federal Meat Inspection Act.

### III.
### Did the District Court Err in Granting Summary Judgment to the Coonses?

In their complaint, the Deiters alleged various theories of liability against the Coonses, but the only theories they argue on appeal is that the Coonses were negligent per se based upon their violation of various provisions of the Federal Meat Inspection Act. With respect to that Act, the Deiters argued to the district court that the Coonses were negligent per se for violating subsections (a), (c), and (d) of 21 U.S.C. § 610.

Subsection (a), (c), and (d) of 21 U.S.C. § 610 provide:

> No person, firm, or corporation shall, with respect to any cattle, sheep, swine, goats, horses, mules, or other equines, or any carcasses, parts of carcasses, meat or meat food products of any such animals—
> **(a) Slaughtering animals or preparation of articles capable of use as human food**
> slaughter any such animals or prepare any such articles which are capable of use as human food at any establishment preparing any such articles for commerce, except in compliance with the requirements of this chapter;
> . . . .
> **(c) Sales, transportation, and other transactions**

sell, transport, offer for sale or transportation, or receive for transportation, in commerce, (1) any such articles which (A) are capable of use as human food and (B) are adulterated or misbranded at the time of such sale, transportation, offer for sale or transportation, or receipt for transportation; or (2) any articles required to be inspected under this subchapter unless they have been so inspected and passed;

**(d) Adulteration or misbranding**

do, with respect to any such articles which are capable of use as human food, any act while they are being transported in commerce or held for sale after such transportation, which is intended to cause or has the effect of causing such articles to be adulterated or misbranded.

In their initial brief opposing the Coonses' motion for summary judgment, the Deiters contended that the Coonses violated the Federal Meat Inspection Act

for three reasons. First, they prepared human food for commerce not in compliance with the requirements of this chapter. Second, they received for transportation food articles which were adulterated at the time of such receipt for transportation. Third, they received food articles that were required to be inspected under this subchapter, given that they were not operating as a "custom exempt" plant.

With respect to their first reason, the Deiters did not point to any provision of the Federal Meat Inspection Act that the Coonses allegedly violated other than "'receiv[ing] for transportation' any beef that is 'adulterated or misbranded at the time of such . . . receipt for transportation' or receive for transportation 'any articles required to be inspected under this subchapter'" and "commit[ting] any act while beef is being held for sale after transportation which is intended to cause or has the effect of causing such articles to be misbranded." The district court held that the Deiters had not presented any evidence showing that the Coonses received the carcass for transportation, and the Deiters have not pointed to any evidence showing that they did. Likewise, there is no evidence that the Coonses held the meat for sale. In fact, the Deiter Contract stated, "When the meat has been cut + wrapped by Don's Meat Joseph and Melinda Deiter will pay Sharon Coons 45¢ lb for *that service* and will pick up their half of the beef." (Emphasis added.) The Coonses were to be paid for their services in preparing the meat. They did not own the meat and did not purport to sell it.

Finally, the Deiters argued that the meat was not exempt from the inspection requirements because the Coonses did not prepare the meat for Ms. Anderson, whom they

contend was the owner, but they prepared the meat for the Deiters and the Kirks. The Deiters stated as follows:

> As the regulations make clear, "[t]he requirements of the Act . . . do not apply to" the following:
>
>> the custom preparation by any person, firm, or corporation of carcasses, parts thereof, meat or meat food products, derived from the slaughter by any person of cattle, sheep, swine, or goats of his own raising, or from game animals, delivered by the owner thereof for such custom preparation, and transportation in commerce of such custom prepared articles, <u>exclusively for use in the household of such owner, by him and members of his household and his nonpaying guests and employees</u>.
>
> 21 U.S.C. § 623(a)(emphasis added).

Based upon the portion of the statute they emphasized, they asserted, "Because the Coons Defendants were not preparing the steer and its meat exclusively for use in the household of Patty Anderson, for use in their own household, or for use in the household of their employees, they were in violation of the Federal Meat Inspection Act." They further explained that "the Coons Defendants knew they were doing the butchering work for two families, the Deiter family and the Kirk family – clearly not the owners of the cow." As explained above, Ms. Anderson was not the owner of the steer when it was slaughtered, nor was she the owner of the carcass when it was delivered to Don's Meats. Mr. Deiter and Mrs. Kirk were the owners. Thus, the Deiters' argument that Don's Meats was not a custom exempt facility was erroneous.

In their supplemental brief filed in opposition to the Coonses' motion for summary judgment, the Deiters contended that the Coonses violated the Federal Meat Inspection Act

> because they have (1) "received for transportation" meat that has not been subject to ante and post-mortem inspection; (2) "prepared" meat that has not been subject to ante and post-mortem inspection; (3) "offered for transportation" meat that has not been subject to ante and post-mortem inspection; and (4) performed an act that "has the effect of causing" meat to be "misbranded" (i.e. labeling meat as "Not for Sale" when in fact it is for sale).

The inspections required by the Federal Meat Inspection Act are an antemortem inspection "of all amenable species before they shall be allowed to enter into any slaughtering, packing, meat-canning, rendering, or similar establishment, in which they are to be slaughtered and the meat and meat food products thereof are to be used in commerce," 21 U.S.C. § 603(a),

11

and a postmortem inspection "of the carcasses and parts thereof of all amenable species to be prepared at any slaughtering, meat-canning, salting, packing, rendering, or similar establishment." 21 U.S.C. § 604.

21 U.S.C. § 623(a) exempts custom exempt facilities from the "provisions of this subchapter requiring inspection of the slaughter of animals and the preparation of the carcasses, parts thereof, meat and meat food products at establishments conducting such operations for commerce." As stated above, the Deiters contended that this exemption did not apply because the meat was not prepared for the owner, Ms. Anderson, but instead for the Deiters and the Kirks. Thus, their assertions that the meat had not been inspected as required by the Federal Meat Inspection Act fails under the Deiters' argument.

It also fails because the Deiters did not present any evidence that either the antemortem inspection or the postmortem inspection was designed to or could determine whether the meat was adulterated with E. coli bacteria. "The elements of a common law negligence action are (1) a duty, recognized by law, requiring the defendant to conform to a certain standard of conduct; (2) a breach of that duty; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual loss or damage." *Black Canyon Racquetball Club, Inc. v. Idaho First Nat. Bank, N.A.*, 119 Idaho 171, 175–76, 804 P.2d 900, 904–05 (1991). "'The effect of establishing negligence *per se* through violation of a statute is to conclusively establish the first two elements of a cause of action in negligence . . . .' 'Negligence *per se* lessens the plaintiff's burden only on the issue of the "actor's departure from the standard of conduct required of a reasonable man."'" *O'Guin v. Bingham Cnty.*, 142 Idaho 49, 52, 122 P.3d 308, 311 (2005) (citations omitted). Thus, to establish their claim the Deiters must prove "a causal connection between the defendant's conduct and the resulting injury."

In their motion for summary judgment, the Coonses contended that "Plaintiffs are unable to prove proximate causation." Absent evidence as to the nature of the inspection and whether it could detect the presence of E. coli bacteria, the Deiters have not presented any evidence to show a causal connection between any alleged failure to have an antemortem or postmortem inspection and their injuries. The Deiters have not shown that there was any genuine issue of material fact supporting the requirement that they establish that the failure to have the inspections caused their injuries.

12

Finally, the Deiters alleged in the district court that the Coonses misbranded the meat by "labeling meat as 'Not for Sale' when in fact it is for sale." As explained above, the Coonses did not sell the meat or hold it for sale. They were paid only to process it. When the carcass was delivered to Don's Meats, it was owned by the Deiters and the Kirks and they retained ownership of the meat. The Coonses were only paid for processing it.

As with Ms. Anderson, the district court held that "commerce" did not apply to intrastate transactions when ruling on the Coonses' motion for summary judgment. "When the trial court reaches the correct result by an erroneous theory, we will affirm the result on the correct theory." *Stapleton v. Jack Cushman Drilling & Pump Co. Inc.*, 153 Idaho 735, 740, 291 P.3d 418, 423 (2012). We therefore affirm the judgment dismissing the complaint as to the Coonses.

On appeal, the Deiters argue additional theories that they contend would support a claim against the Coonses for negligence per se, but we will not consider them because they were not argued in the district court. "An appellant is bound by the issues and theories upon which the case was tried below. Although a judgment may be sustained upon any legal theory, a new theory cannot be employed on appeal to attack the judgment." *Clements Farms, Inc.* 120 Idaho at 207, 814 P.2d at 939.

## IV.
### Are Defendants Entitled to an Award of Attorney Fees on Appeal?

Both Ms. Anderson and the Coonses request an award of attorney fees on appeal pursuant to Idaho Code section 12-121. "In normal circumstances, attorney fees will only be awarded when this court is left with the abiding belief that the appeal was brought, pursued or defended frivolously, unreasonably or without foundation." *Minich v. Gem State Developers, Inc.*, 99 Idaho 911, 918, 591 P.2d 1078, 1085 (1979). We do not find that this appeal was brought or pursued frivolously, unreasonably, or without foundation. Therefore, we will not award them attorney fees on appeal.

## V.
### Conclusion.

We affirm the judgment of the district court, and we award Respondents costs, but not attorney fees, on appeal.

Justice HORTON and Justice Pro Tem WALTERS CONCUR.

13

BURDICK, C.J., concurring in part and dissenting in part.

I concur with the majority insofar as it affirms summary judgment to Anderson. I write separately to respectfully dissent from the majority's analysis in Part III, where it affirms summary judgment to the Coonses.

As the majority correctly recites, the Deiters asserted the Coonses violated the Federal Meat Inspection Act (FMIA) in three main ways:

> First, they prepared human food for commerce not in compliance with the requirements of this chapter. Second, they received for transportation food articles which were adulterated at the time of such receipt for transportation. Third, they received food articles that were required to be inspected under this subchapter, given that they were not operating as a "custom exempt" plant.

The shortcomings of the majority's analysis emerge when the Deiters' first argument is addressed. The majority overlooks how the FMIA defines "prepare" to mean "slaughtered, canned, salted, rendered, boned, cut up, or otherwise manufactured or processed." 21 U.S.C. § 601(l). Indeed, the majority never acknowledges the FMIA's broad definition of "prepare." As a result, the majority is led to sidestep the Deiters' argument, raised before the district court, triggering the FMIA's broad definition of "prepare"—*i.e.*, that "the Coons Defendants clearly dealt with 'adulterated' beef that they further processed into steaks, roasts, and ground beef." That assertion, if true, would indicate a violation of 21 U.S.C. § 610(a). But perhaps most critical in this regard, the district court made no finding as to whether the Coonses "prepared" the beef in violation of the FMIA, and I would therefore adhere to precedent and refrain from doing so on appeal. *Cf. Boise Tower Assocs., LLC v. Hogland*, 147 Idaho 774, 784, 215 P.3d 494, 504 (2009) (remanding case for resolution of issues the district court never reached).

Further, I cannot agree with the majority's conclusion that "the Deiters' argument that Don's Meats was not a custom exempt facility was erroneous." 21 U.S.C. § 623 governs exemptions and specifically exempts "[p]ersonal slaughtering and custom slaughtering for personal, household, guest, and employee uses." That provision states:

> The provisions of this subchapter requiring inspection of the slaughter of animals and the preparation of the carcasses, parts thereof, meat and meat food products at establishments conducting such operations for commerce shall not apply to [1] the slaughtering by any person of animals of his own raising, and the preparation by him and transportation in commerce of the carcasses, parts thereof, meat and meat food products of such animals exclusively for use by him and members of his household and his nonpaying guests and employees; [2] nor to the custom slaughter by any person, firm, or corporation of cattle, sheep, swine or

14

goats delivered by the owner thereof for such slaughter, and the preparation by such slaughterer and transportation in commerce of the carcasses, parts thereof, meat and meat food products of such animals, exclusively for use, in the household of such owner, by him and members of his household and his nonpaying guests and employees; [3] nor to the custom preparation by any person, firm, or corporation of carcasses, parts thereof, meat or meat food products, derived from the slaughter by any person of cattle, sheep, swine, or goats of his own raising, or from game animals, delivered by the owner thereof for such custom preparation, and transportation in commerce of such custom prepared articles, exclusively for use in the household of such owner, by him and members of his household and his nonpaying guests and employees: . . . *Provided further*, That custom operations at any establishment shall be exempt from inspection requirements as provided by this section only if the establishment complies with regulations which the Secretary is hereby authorized to promulgate to assure that any carcasses, parts thereof, meat or meat food products wherever handled on a custom basis, or any containers or packages containing such articles, are separated at all times from carcasses, parts thereof, meat or meat food products prepared for sale, and that all such articles prepared on a custom basis, or any containers or packages containing such articles, are plainly marked "Not for Sale" immediately after being prepared and kept so identified until delivered to the owner and that the establishment conducting the custom operation is maintained and operated in a sanitary manner.

21 U.S.C. § 623(a). Thus, the above furnishes three situations in which the slaughter and preparation of meat are exempt. The Coonses argue they are exempt as a custom operation under the third situation, which exempts:

[T]he custom preparation by any person, firm, or corporation of carcasses, parts thereof, meat or meat food products, derived from the slaughter by any person of cattle, sheep, swine, or goats of his own raising, or from game animals, delivered by the owner thereof for such custom preparation, and transportation in commerce of such custom prepared articles, exclusively for use in the household of such owner, by him and members of his household and his nonpaying guests and employees[.]

*Id.* Distilled, the plain language of this exemption covers entities that prepare meat slaughtered by any person of cattle of his own raising, which was delivered by the owner of the beef for custom preparation that is exclusively for the owner's household use. In other words, two main requirements must be met for the Coonses to fit this exemption: (1) the same person who raised the beef must have slaughtered it; and (2) the owner must have delivered it to the Coonses for processing for the owner's exclusive household use.

Both requirements are lacking in this case. First, the same person who raised the beef did not slaughter it. Instead, Anderson recruited Janak, Inc., a mobile slaughtering business, to

15

slaughter the beef after it had already been raised. Second, the owner of the beef did not deliver it to the Coonses. Rather, Janak, Inc. delivered the beef to the Coonses after the slaughter. And, at that time, the Deiters owned the beef, not Janak, Inc. Thus, the custom exemption does not apply to the Coonses.[1] But even if it did, the Coonses would be exempt "only if the[y] . . . compl[y] with regulations which the Secretary is hereby authorized to promulgate," as stated under 21 U.S.C. § 623(a). Those regulations—numerous and detailed[2]—have neither been addressed by the majority nor argued by the parties at any proper length on appeal.

Finally, the majority maintains that summary judgment is properly affirmed because the Deiters have presented no evidence of proximate cause. Given this Court's clearly defined role under Article 5, Section 9 of the Idaho Constitution "to review, upon appeal, any decision of the district court[]," I would refrain from reaching the issue of proximate cause. The district court never reached the issue of proximate cause; therefore, no decision on that issue exists for this Court to review. This Court has so held in the past, and today should be no different. *E.g.*, *Ada Cty. Highway Dist. v. Total Success Invs., LLC*, 145 Idaho 360, 368, 179 P.3d 323, 331 (2008) ("This Court does not review an alleged error on appeal unless the record discloses an adverse ruling forming the basis for the assignment of error."). In any event, unlike the majority, I do not believe we are equipped to resolve proximate cause as a matter of law in this case. None of the Coons' proximate cause arguments are properly suited for a negligence *per se* causation analysis—*i.e.*, whether the Coonses violated the FMIA, and if so, whether that violation caused the Deiters' injuries.

For the above reasons, I am unable to join Part III of the majority's opinion.

Justice J. Jones, Pro Tem, **concurs.**

---

[1] I note that the U.S. Senate introduced a bill that, if enacted, would produce a different result. If enacted, the Processing Revival and Intrastate Meat Exemption Act would exempt from the FMIA custom preparation, like the Coons' processing in this case, if that preparation is (1) "carried out in accordance of the law of the State in which the custom slaughter facility is located"; and (2) "prepared exclusively for distribution to . . . (i) household consumers within the State . . . ." S. 2651, 114th Cong. (as introduced by the U.S. Senate on March 8, 2016). However, because that bill has not been enacted, we must apply the plain language of the statute in effect.
[2] *See* 9 C.F.R. § 303.1.