122 P.3d 308

Frank and Leslie O'GUIN, husband and wife, individually, and in their capacity as parents and legal guardians of Frank O'Guin, Jr., a minor, Plaintiffs–Appellants,

v.

BINGHAM COUNTY; Bingham County Commissioners; and Bingham County Public Works, a political subdivision, Defendants–Respondents.

No. 30344.

Supreme Court of Idaho, Boise, March 2005 Term.

Oct. 3, 2005.

---

Comstock & Bush, Boise, for appellants. John A. Bush argued.

Anderson, Nelson, Hall & Smith, Idaho Falls, for respondents. Blake G. Hall argued.

TROUT, Justice.

Frank and Leslie O'Guin, acting as individuals and as legal guardians of Frank O'Guin Jr. (the O'Guins), appeal the district court's grant of summary judgment in favor of Bingham County, Bingham County Commissioners and Bingham County Public Works, (collectively the County). Because the district court erred in its determinations regarding the negligence *per se* claim, we reverse the grant of summary judgment.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

On July 7, 1999, Shaun and Alex O'Guin were killed while playing at the Bingham County landfill. Apparently, a section of the pit wall collapsed and crushed the children. Their older brother, Frank Jr., initially discovered their bodies at the bottom of the pit. Earlier that day, the children had been eating lunch at Ridgecrest Elementary School as part of a summer lunch program. As they started walking home, the children went through an unlocked gate at the back of the schoolyard and through a privately owned empty field. The empty field is situated between the landfill and the schoolyard. The border between the empty field and the landfill was unobstructed. At the time of the children's death, the landfill was open to the public one day a week. It was closed on the day the children were killed and no landfill employees were present on the site.

The O'Guins filed an action alleging the landfill was an attractive nuisance and that the County breached certain legal duties to control access to the landfill. The County filed a motion for summary judgment. In ruling on the motion, the district court dismissed the attractive nuisance claim for failure to assert facts that prove an essential element of the claim but denied the motion as to the common law negligence claim and the negligence *per se* claim. The County requested permission to appeal and in response to the County's request, the district court *sua sponte* reconsidered its original decision on the motion for summary judgment and issued a substitute decision. In its substitute decision, the district court granted summary judgment to the County on all claims. On appeal to this Court, we affirmed summary judgment on the attractive nuisance and common law negligence claims. Because the district court's substitute decision did not address the negligence *per se* claim, we remanded the case to the district court for further consideration. *See O'Guin v. Bingham County*, 139 Idaho 9, 72 P.3d 849 (2003). Upon remand, the County renewed its motion for summary judgment on the negligence *per se* claim and the district court granted the motion. The O'Guins again appealed.

## II.

## STANDARD OF REVIEW

"Generally, the question of whether a duty exists is a question of law, over which we exercise free review." *Udy v. Custer County*, 136 Idaho 386, 389, 34 P.3d 1069, 1072 (2001). Negligence *per se*, which results from the violation of a specific requirement of law or ordinance, is a question of law, over which this Court exercises free review. *Ahles v. Tabor*, 136 Idaho 393, 395, 34 P.3d 1076, 1078 (2001).

## III.

## ANALYSIS

### A. Negligence *Per Se* Claim

The dispute in this case focuses on the duty or standard of care the County owed to the O'Guin children. The parties disagree on how the common law duty of a landowner to a trespasser affects the statutory duty of a landfill owner. The O'Guins argue that once the district court determined the regulations established a duty and the County had breached that duty, there was no need to apply the common law willful or wanton stan-

dard. The County argues that because the O'Guin children were trespassers, even if the requirements of negligence *per se* are met, the O'Guins must still prove that the County's conduct was willful or wanton, and the O'Guins have failed to allege that in their complaint. The County also argues that negligence *per se* does not apply here.

■■■ "The elements of a common law negligence action are (1) a duty, recognized by law, requiring the defendant to conform to a certain standard of conduct; (2) a breach of that duty; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual loss or damage." *Black Canyon Racquetball Club, Inc. v. Idaho First Nat'l Bank, N.A.*, 119 Idaho 171, 175–76, 804 P.2d 900, 904–05 (1991). The distinction between trespassers, licensees and invitees is the controlling test in determining the scope and extent of the duty of care owed by landowners to entrants. *See Huyck v. Hecla Mining Co.*, 101 Idaho 299, 612 P.2d 142 (1980). "A landowner's duty to a trespasser is to refrain from willful or wanton acts which might cause injury." *Peterson v. Romine*, 131 Idaho 537, 540, 960 P.2d 1266, 1269 (1998) (citing *Huyck*, 101 Idaho at 301, 612 P.2d at 144). In the first appeal in this case, this Court held "the facts before the district court support the court's conclusion that the boys were trespassing at the time of the accident." *O'Guin v. Bingham County*, 139 Idaho 9, 13, 72 P.3d 849, 853 (2003). This Court also affirmed the summary judgment entered against the O'Guins on the common law negligence claim because the complaint "[did] not allege any willful or wanton conduct by the County [nor a] breach of the duty owed to a trespasser." *Id.* at 15, 72 P.3d at 855.

### Negligence Per se

■■■ "[I]n Idaho, it is well established that statutes and administrative regulations may define the applicable standard of care owed, and that violations of such statutes and regulations may constitute negligence *per se*." *Sanchez v. Galey*, 112 Idaho 609, 617, 733 P.2d 1234, 1242 (1986). "A court may adopt 'as the standard of conduct of a reasonable man the requirements of a legislative enactment or an administrative regulation....'" *Brizendine v. Nampa Meridian Irr. District*, 97 Idaho 580, 586, 548 P.2d 80, 86 (1976) (quoting RESTATEMENT (SECOND) OF TORTS § 286 (1965)). "The effect of establishing negligence *per se* through violation of a statute is to conclusively establish the first two elements of a cause of action in negligence...." *Slade v. Smith's Management Corp.*, 119 Idaho 482, 489, 808 P.2d 401, 408 (1991). "Negligence *per se* lessens the plaintiff's burden only on the issue of the 'actor's departure from the standard of conduct required of a reasonable man.'" *Ahles v. Tabor*, 136 Idaho 393, 395, 34 P.3d 1076, 1078 (2001) (quoting RESTATEMENT (SECOND) OF TORTS § 288B cmt. B (1965)). "Thus, the elements of duty and breach are 'taken away from the jury.'" *Ahles*, 136 Idaho at 395, 34 P.3d at 1078 (quoting *Prosser and Keeton on Torts* 230 (5th ed.1984)).

■■■ In order to replace a common law duty of care with a duty of care from a statute or regulation, the following elements must be met: (1) the statute or regulation must clearly define the required standard of conduct; (2) the statute or regulation must have been intended to prevent the type of harm the defendant's act or omission caused; (3) the plaintiff must be a member of the class of persons the statute or regulation was designed to protect; and (4) the violation must have been the proximate cause of the injury. *Ahles*, 136 Idaho at 395, 34 P.3d at 1078 (citing *Sanchez v. Galey*, 112 Idaho 609, 617, 733 P.2d 1234, 1242 (1986)).

As to the first element, the district court found, and we agree, that the statute and regulations in this case clearly define the County's standard of conduct. Idaho Code Title 39, Chapters 1 and 74 grant authority to the Board of Environmental Quality to adopt solid waste management rules and standards. Those rules require municipal solid waste landfill units to block access by unauthorized persons. The rule in effect at the time of the boys' deaths provided in pertinent part:

Solid waste management sites shall comply with the following:

. . .

e. Access to the site shall be limited to those times when an attendant is on duty.

 i. Hours of operation and other limitations shall be prominently displayed at the entrance.

 ii. The site shall be fenced or otherwise blocked to access when an attendant is not on duty.

 iii. Unauthorized vehicles and persons shall be prohibited access to the site.

IDAPA 58.01.06.005.02. In addition, Idaho Code § 39–7412(6) states that owners or operators of all municipal solid waste landfill units shall "[p]rovide and control access as provided in 40 CFR 258.25." That section of the Code of Federal Regulations states:

> Owners or operators of all municipal solid waste landfill units must control public access and prevent unauthorized vehicular traffic and illegal dumping of wastes by using artificial barriers, natural barriers, or both, as appropriate to protect human health and the environment.

40 C.F.R. § 258.25. These regulations require the County to fence or otherwise block access to the landfill when an attendant is not on duty. The Legislature has specifically declared it to be "unlawful" to fail to comply with the landfill rules. I.C. § 39–7402(1). In this case, the record reveals that on July 7, 1999, some of the landfill boundaries were not fenced or blocked. There is also evidence that the landfill was closed and no attendant was on duty on July 7, 1999. Therefore, the district court was correct that the regulations clearly define the County's required standard of conduct, and the County failed to meet that standard.

The second element asks whether the death of the O'Guin children is the type of harm the statute and regulations were intended to prevent. Idaho Code Section 39–7401(2) states:

> [I]t is the intent of the legislature to establish a program of solid waste management which complies with 40 CFR 258 and facilitates the incorporation of flexible standards in facility design and operation. The legislature hereby establishes the solid waste disposal standards and procedures outlined herein and a facility approval process for the state of Idaho, the political subdivisions thereof, and any private solid waste disposal site owner in order to facilitate the development and operation of solid waste disposal sites, to effect timely and responsible completion of statutory duties and to ensure protection of human health and the environment, to protect the air, land and waters of the state of Idaho.

I.C. § 39–7401(2). This section demonstrates the legislature's desire to ensure the "protection of human health" in the "development and operation of solid waste disposal sites." It also makes specific reference to 40 C.F.R. § 258. As quoted previously, Section 258.25 of the Code of Federal Regulations states "[o]wners or operators of all municipal solid waste landfill units must control public access . . . by using artificial barriers, natural barriers, or both, as appropriate to protect human health . . . ." Further indication of the intent of this section can be found in the Technical Manual on Solid Waste Disposal Facility Criteria (Manual) promulgated by the United States Environmental Protection Agency. The Manual contains a disclaimer that the policies set forth in the Manual are not intended to create any enforceable rights in litigation and are simply for guidance. However, the Manual can serve to give further insight into the interpretation of the provisions in the CFR. Specifically, Section 3.7.3 entitled "Technical Considerations" relates to the access requirements of 40 CFR § 258.25 and provides in part

> Frequently, unauthorized persons are unfamiliar with the hazards associated with landfill facilities, and consequences of uncontrolled access may include injury and even death. Potential hazards are related to inability of equipment operators to see unauthorized individuals during operation of equipment and haul vehicles; direct exposure to waste (e.g., sharp objects and pathogens); inadvertent or deliberate fires; and earth-moving activities.

This provision indicates a broad definition of what is intended by "protection of human health" and certainly includes possible injury or death to people on the facility grounds. Operators of a landfill have a duty not only to

prevent illegal dumping and unauthorized vehicular traffic, but to control public access as well.

The County argues that the intent of these provisions is merely to prevent unauthorized vehicular traffic and illegal dumping. However, the inclusion of physical injury to "unauthorized individuals" by equipment or earth-moving activities, as potential landfill hazards, would indicate otherwise. A similar hazard is presented by a dangerously sloping wall in the landfill. The O'Guin's expert testified that the angle of the slope where the accident occurred "was extremely dangerous" and violative of EPA and OSHA regulations. These statutes and rules demonstrate that the Legislature intended to safeguard both human health and safety.[1] The injury to the safety of the O'Guin children is the type of harm the Idaho statute and regulations were intended to prevent because the children's deaths relate directly to control of public access and protection of human health and safety.

As to the third element, the O'Guin children are members of the class of persons the regulations were designed to protect. The regulations state "[u]nauthorized vehicles and persons shall be prohibited access to the site." IDAPA 58.01.06.005.02. As trespassers, the O'Guin children were certainly "unauthorized persons" and the regulations do not differentiate between the unauthorized person who comes to the landfill to dump improper materials and the unauthorized person who comes to the landfill to play. Furthermore, the regulations require the landfill "be fenced or otherwise blocked to access when an attendant is not on duty." IDAPA 58.01.06.005.02. This regulation demonstrates the connection between the requirement that the landfill perimeter be fenced or blocked and the protection of persons whose access is unauthorized. Therefore, the regulations controlling access were designed to protect the human health and safety of the unauthorized person who comes

to a landfill when an attendant is not on duty and the O'Guin children fit within that category.

Finally, as to the fourth element, there is at least a disputed issue of fact created by an affidavit in the record, as to whether the County's violation of the statute and regulations resulted in the O'Guin children's deaths.

### Statutory Duty

 After concluding the regulations established a duty and that the County had breached that duty, the district court held "the O'Guins' allegations of negligence *per se* do not change the duty owed by the County to trespassers." This was error. There was no need for the district court to look to the common law duty owed to trespassers once it determined the statutory duty applied. "Liability may become established upon proof that the violation of the statute caused the injuries of the plaintiff and the plaintiff's subsequent damages." *Slade v. Smith's Management Corp.*, 119 Idaho 482, 489, 808 P.2d 401, 408 (1991) (citing *Leliefeld v. Johnson*, 104 Idaho 357, 370, 659 P.2d 111, 124 (1983)). A statute that adequately defines the required standard of care "supplants the reasonable person standard encompassed in the concept of ordinary negligence." *Ahles*, 136 Idaho at 395, 34 P.3d at 1078 (citing 57A AM.JUR.2D *Negligence* § 748 (1989)). If a breach of the County's statutory duty requires willful or wanton conduct, imposition of the common law's higher burden would be contrary to the express language of the statute and essentially remove the statutory command to fence or otherwise block access to unauthorized users.

Relying upon this Court's decision in *Petersen v. Parry*, 92 Idaho 647, 448 P.2d 653 (1968), the district court held the O'Guins were required "to demonstrate that the County willfully and wantonly violated the IDEQ Rules and Standards governing access

---

1. A further indication of the intent to protect the public appears in a subsequent revision to the landfill rules in which existing landfills were required to comply with 40 C.F.R. 257.3 for the two-year period beginning April 26, 2002. *See* IDAPA 58.01.06.011–013. Sub-part 8 of that

C.F.R. regulation, entitled "Safety," states in pertinent part, "A facility or practice shall not allow uncontrolled public access so as to expose the public to potential health and safety hazards at the disposal site.

control." In *Petersen*, two cars collided and all occupants were killed. The parents of a minor occupant brought an action for negligence. Prior to the collision, the cars were traveling in opposite directions, with one car driving on the right half of the roadway while the other car was driving substantially on the wrong half of the roadway. The parents sought to use the violation of a statute that required vehicles be driven on the right half of the roadway to establish negligence *per se*. This Court noted that under the facts of the case, violation of the statute constituted negligence *per se* but that a separate statute increased the burden of proof to require a showing of "gross negligence." At the time, the other statute was known as I.C. § 49–1401. It stated:

> Liability of motor owner to guest—No person transported by the owner or operator of a motor vehicle as his guest without payment for such transportation shall have a cause for damages against such owner or operator for injures, death or loss, in case of accident, unless such accident shall have been intentional on the part of the said owner or operator or caused by his intoxication or gross negligence.

This Court concluded that because the deceased minor was a guest within the purview of the statute and because there was no contention that the accident was intentional or caused by intoxication, liability had to be predicated upon evidence showing conduct that constituted gross negligence. *Petersen*, 92 Idaho at 654, 448 P.2d at 660. It was in that context that this Court held:

> '[N]egligence per se' merely means 'ordinary negligence per se.' I have found no Idaho authority holding that the naked violation of a positive statute such as [the statute requiring vehicles be driven upon the right half of the roadway] constitutes gross negligence per se. . . .

*Id.* at 653, 448 P.2d at 659. The O'Guins' situation is distinguishable from the situation in *Petersen*. Although both cases involved the violation of a statute or regulation (the violation in *Petersen* was driving on the wrong side of the road; the violation in this case is the County not fencing or preventing unauthorized access), the plaintiffs in *Petersen* were required by an unrelated statute to show the defendant's conduct constituted gross negligence. Unlike the situation in *Petersen*, there is no statute applicable to the O'Guins that raises their burden of proof. The district court in this case apparently thought the common law duty owed by a landowner to trespassers to refrain from wanton or willful conduct, was analogous to the statute in *Petersen* that raised the burden of proof. This is shown by the district court's comparison of *Petersen* to the O'Guins. The district court stated:

> [T]he plaintiffs [in *Petersen* ] were still required to demonstrate gross negligence despite the fact that the driver was guilty of "ordinary" negligence *per se*. Therefore, where, as in this case, a more onerous burden of proof is imposed upon a plaintiff, proof of a "naked" violation of a statutory duty of care by the defendant will not meet that more onerous burden of proof.

The analogy between the statute in *Petersen* and the common law duty of landowners in O'Guin is flawed. The guest statute in *Petersen* was an express mandate by the legislature specifically designed to raise the burden of proof to a level higher than that required in ordinary actions for damages against owners or operators of vehicles. On the other hand, the common law duty of landowners to trespassers merely defines the standard of conduct a reasonable landowner in a common law negligence action owes to trespassers. Standing alone, the regulations in this case are sufficient to satisfy the duty element for a negligence *per se* action. The O'Guins' use of statutory obligations to establish the County's duty under a negligence *per se* action replaces the common law duty of landowners to trespassers. Consequently, the district court erred in requiring the O'Guins to plead and prove a willful and wanton violation of the landfill owner regulations.

## B. Attorney Fees On Appeal

The County requests attorney fees on appeal pursuant to I.C. § 6–918A. That section requires "a showing, by clear and convincing evidence, that the party against whom or which such award is sought was

guilty of bad faith in the commencement, conduct, maintenance or defense of the action." I.C. § 6–918A. Because there is no indication that the O'Guins were guilty of bad faith in the commencement, conduct, or maintenance of this action, and indeed, have prevailed twice now on appeal, there is no basis for an award of attorney fees.

## IV.

## CONCLUSION

The district court erred in determining that the County's violations here were not negligence *per se* and by applying the common law willful or wanton standard to the O'Guins' claim. The district court's grant of summary judgment is vacated and the case remanded for further proceedings. We award costs on appeal to the O'Guins.

Chief Justice SCHROEDER, Justice JONES and Justice WALTERS, Pro Tem concur.

Justice EISMANN, Dissenting.

I cannot concur in the majority opinion because the regulations cited therein as supporting a claim of negligence *per se* were clearly not intended to prevent the type of harm involved in this case.

I agree that the common law rule regarding the liability of a landowner to trespassers can be modified by legislation or an administrative regulation that modifies the applicable standard of care. To base a claim of negligence upon the violation of a statute or regulation, however, the statute or regulation must have been intended to prevent the type of harm the defendant's act or omission caused. *Munns v. Swift Transp. Co., Inc.,* 138 Idaho 108, 58 P.3d 92 (2002).

The majority opinion relies upon IDAPA 58.01.06.005.02 and 40 C.F.R. 258.25 as providing the applicable standard of care. Neither of those regulations is intended to prevent trespassers from injuring themselves through an accident at a landfill. They are intended to prevent trespassers from dump-

ing or salvaging materials that may be harmful to health or the environment.

The purpose of the IDAPA rules is stated in IDAPA 58.01.06.004.01 and .02, which provide:

**01. Solid Waste Management.** All solid waste shall be managed, whether it be during storage, collection, transfer, transport, processing, separation, incineration, composting, treatment, reuse, recycling, or disposal, to prevent health hazards, public nuisances, or pollution of the environment.

**02. Requirements.** Solid wastes shall be managed such that they shall not:

a. Provide sustenance to rodents or insects which are capable of causing human disease or discomfort.

b. Cause or contribute to the pollution of the air.

c. Cause or contribute to the pollution of surface or underground waters.

d. Cause excessive abuse of land.

e. Cause or contribute to noise pollution.

f. Abuse the natural aesthetic quality of an area.

g. Physically impair the environment to the detriment of man and beneficial plant life, fish, and wildlife.

The regulations are intended to protect against health hazards from pollution and disease. They are not intended to protect against injury from accidents. The same holds for 40 C.F.R. 258.25, which states:

Owners or operators of all MSWLF [municipal solid waste landfill] units must control public access and prevent unauthorized vehicular traffic and illegal dumping of wastes by using artificial barriers, natural barriers, or both, as appropriate to protect human health and the environment.

The concern is illegal dumping of wastes that are dangerous to human health and the environment. The word "health" is not normally construed to include freedom from accidents. Rather, it simply means "freedom from disease or abnormality."[2] The majority can

2. The American Heritage Dictionary of the English Language (4th ed.2000), *available at*

reach its conclusion only by redefining the word "health" to include "safety." Such redefinition is not supported either by Idaho law or by the federal regulations.

Idaho Code § 39–7401(2) states that the legislature's intent when it adopted the Idaho Solid Waste Facilities Act was "to establish a program of solid waste management which complies with 40 C.F.R. 258." The purpose of Section 258 is to establish minimum national criteria for all municipal solid waste landfills which will "ensure the protection of human health and the environment." 40 C.F.R. 258.1(a). Consistent with that purpose, Section 258.25 requires owners or operators of municipal solid waste landfill units to "control public access and prevent unauthorized vehicular traffic and illegal dumping of wastes by using artificial barriers, natural barriers, or both, as appropriate to protect human health and the environment." 40 C.F.R. 258.25. The regulation only requires barriers to prevent "unauthorized vehicular traffic and illegal dumping of wastes." The required barriers need not be able to keep out trespassing pedestrians who may accidentally injure themselves at the landfill.

The majority quotes a portion of § 3.7.3 from the Solid Waste Disposal Facility Criteria technical manual for its construction of 40 C.F.R. § 258.25 in order to arrive at the conclusion that Bingham County was required to fence out trespassing pedestrians from its landfill. Reading that entire subsection of the technical manual shows that the

majority's interpretation is wrong. The last paragraph of that subsection states:

Acceptable measures to limit access of unauthorized persons to the disposal facility include gates and fences, trees, hedges, berms, ditches, and embankments. Chain link, barbed wire added to chain link, and open farm-type fencing are examples of fencing that may be used. Access to facilities should be controlled through gates that can be locked when the site is unsupervised. Gates may be the only additional measure needed at remote facilities.

Obviously, barriers consisting of "trees, hedges, berms, ditches, and embankments" or "open farm-type fencing" are not designed to keep out trespassing pedestrians. They are only designed to keep out vehicles that may be transporting waste into the facility when it is closed. The fact that these types of barriers are expressly stated as being acceptable shows that the regulation was not intended to require municipal solid waste disposal facilities to fence out trespassing pedestrians.

The federal regulation dealing with the physical safety, as opposed to the health, of trespassers entering the landfill is 40 C.F.R. 257.3–8(d). That regulation, which is entitled "Safety," states, "A facility or practice shall not allow uncontrolled public access so as to expose the public to potential health and safety hazards at the disposal site." If the word "health" included "safety," as the majority contends, then there would have been no reason to adopt 40 C.F.R. 257.3–8(d). It

---

http:/www.dictionary.reference.com/search?= health.htm. Another dictionary defines "health" as follows:

**1a:** the condition of an organism or one of its parts in which it performs its vital functions normally or properly: the state of being sound in body or mind <nursed him back to ~> <he is the picture of ~> <dental ~> <mental ~>—compare DISEASE **b:** the condition of an organism with respect to the performance of its vital functions esp. as evaluated subjectively or nonprofessionally <how is your ~ today> <never in better ~> <her ~ is very delicate> <broken in ~> <went traveling for his ~>.

Webster's Third New International Dictionary of the English Language1043 (Philip Babcock Gove et al. eds., 1971). Webster's definition of

"health" states that it should be compared with "disease," which it defines as follows:
 **b** (1): an impairment of the normal state of the living animal or plant body or of any of its components that interrupts or modifies the performance of the vital functions, being a response to environmental factors <as malnutrition, industrial hazards, or climate>, to specific infective agents <as worms, bacteria, or viruses, to inherent defects of the organism as various genetic anomalies>, or to a combination of these factors: SICKNESS, ILLNESS (2): a particular instance or kind of such impairment <baby-pig ~> <hampered by her ~>: MALADY, AILMENT—compare HEALTH.
*Id.* at 648. Black's Law Dictionary, 724 (7th ed.1999), defines "health" as: "**1**. The state of being sound or whole in body, mind, or soul. **2.** Freedom from pain or sickness."

would merely be surplusage. Indeed, if the word health included safety then there would be no reason for 40 C.F.R. 257.3–8(d) to expressly mention both health and safety. Although 40 C.F.R. 257 requires prohibiting uncontrolled public access in order to protect against potential "safety hazards at the disposal site," such regulation does not apply in this case.[3]

Finally, the majority notes in footnote 1 of its opinion that years after the accident in this case IDAPA 58.01.06.011–.013 was amended to require that landfills comply with 40 C.F.R. 257.1–.3 within two years after April 26, 2002. The majority contends that this amendment supports its position because "Sub-part 8 of that C.F.R. regulation, entitled 'Safety,' states in pertinent part, 'A facility or practice shall not allow uncontrolled public access so as to expose the public to potential health and safety hazards at the disposal site.' "

I cannot see how this amendment supports the reasoning of the majority opinion. IDAPA 58.01.06.004 already required that landfills be managed "to prevent health hazards," and such management include limiting access to the site to those times when an attendant is on duty. If the word "health" was already intended to include "safety," then there would have been no need to later amend IDAPA to incorporate the safety requirements set forth in 40 C.F.R. 257.3–8. Rather than supporting the majority's argument, this amendment to IDAPA shows that at the time of the accident in this case, the meaning of the word "health" did not include "safety." Rather, health should simply be given its usual, plain, and ordinary meaning. Although this was a tragic accident, it is not proper for this Court to retroactively amend the regulations to require municipalities to fence out trespassing pedestrians.

---

**3.** The criteria in 40 C.F.R. 257 "do not apply to municipal solid waste landfill units, which are subject to the revised criteria contained in part 258 of this chapter." 40 C.F.R. § 257.1(a)(10). A "municipal solid waste landfill" is one that receives household waste. 40 C.F.R. § 257.2.