# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 44074-2016

| | |
|---|---|
| HILL-VU MOBILE HOME PARK, on behalf of itself and all others similarly situated; and ED QUINN, on behalf of himself and all others similarly situated, )<br>)<br>)<br>)<br>)<br>) | Boise, June 2017 Term<br><br>2017 Opinion No. 96 |
| Plaintiffs-Appellants, )<br>) | Filed: September 6, 2017 |
| v. )<br>) | Karel A. Lehrman, Clerk |
| CITY OF POCATELLO, an Idaho municipality, )<br>)<br>)<br>) | |
| Defendant-Respondent. )<br>) | |

Appeal from the District Court of the Sixth Judicial District of the State of Idaho, in and for Bannock County. Hon. Stephen S. Dunn, District Judge.

The judgment of the district court is <u>vacated</u> and this case is <u>remanded</u>.

Nathan M. Olsen, Petersen Moss Hall & Olsen, Idaho Falls, argued for appellants.

Blake G. Hall, Hall Angell & Associates, LLP, Idaho Falls, argued for respondent.

_____

EISMANN, Justice.

This is an appeal out of Bannock County from a judgment dismissing an action seeking to recover money unlawfully collected by the City of Pocatello from users of the City's water and sewer systems. We vacate the judgment and remand this case for further proceedings that are consistent with this opinion.

## I.

### Factual Background.

The City of Pocatello ("City") owns and operates water and sewer systems for City residents. In 2005, the city government decided that the City should be able to operate its water

and sewer systems at a profit like private utilities. By law, the City is required to charge and collect sufficient fees so that its water and sewer systems "shall be and always remain self-supporting." I.C. § 50-1032. Those fees had to be sufficient to pay when due all bonds and interest as required by Idaho Code section 50-1032(a) and "to provide for all expenses of operation and maintenance of such works . . . , including reserves therefor," as required by Idaho Code section 50-1032(b). The reserves can also provide for improvements to such systems. I.C. § 50-1033.

The City wanted to obtain a profit in excess of the amounts necessary for the water and sewer systems to remain self-supporting. This profit was paid into the general fund. City officials believed that the City should be able to make a profit just as private utilities are able to do, and so the City added an additional charge to water and sewer bills. The City called this additional charge a "rate of return" or "return on equity," which was an increased charge (profit) included in the bills sent to users of the City's water and sewer systems. As explained by the City's Chief Financial Officer: "The 'rate of return' policy refers to city-owned public utilities (i.e. water, sewer, etc.) making a transfer to the general fund. These are businesses operated by the public that could and do operate as for-profit private enterprises in other communities." This charge was in addition to the statutorily permitted charges to cover the costs of operation, maintenance, replacement and depreciation, including creating and maintaining reserves for such expenses. The City also adopted a policy called "PILOT," which stood for payment in lieu of taxes. Under this scheme, the city-owned water and sewer departments were required to pay "property taxes" to the City as if they were private entities, and the departments then passed this cost on to their customers. The "property taxes" were then paid into the City's general fund. As explained by the City's Chief Financial Officer in 2012: "For the past two years, the rates have been re-described as a franchise fee (% of gross revenues) and a payment-in-lieu-of-taxes (PILOT) to make it directly comparable to private utilities operating in the community such as Intermountain Gas. The PILOT is calculated on the prior year city property tax levy rate multiplied by the estimated market value per the most recent financial plan prepared by an outside consulting engineer."

By letter dated December 26, 2006, Pocatello Mayor Chase asked the Attorney General about the City's policy of imposing the additional charge for a rate of return. In the letter, the Mayor stated:

Charging a rate of return is commonly used by public utilities and private sector companies, and we feel it is a fairer way to generate revenue for the City. As I am sure you are well aware, relying on property taxes for revenue will not work in Pocatello due to the number of property tax exemptions given by the State. Therefore, it has been my practice as Mayor to move our city away from property taxes and to a fee based system. The rate of return is an important part of this plan.

By letter dated February 6, 2007, a Deputy Attorney General responded to Mayor Chase's letter. In that letter, the Deputy wrote with respect to the City's rate-of-return charge: "The overall rate of return for the same utilities [Idaho's three largest electric utilities] range [sic] between 8.1% and 9.25%. According to the Robinson letter, the city's "rate of return" is equal to 7% and generates approximately $3.54 million in revenues." The letter included an analysis of applicable law, and it concluded that analysis by stating: "In this instance, the revenue from the rate of return component is dedicated to the city's general fund and is utilized as a property tax substitute. Thus, it appears this practice is contrary to *Loomis* [*v. City of Hailey*, 119 Idaho 434, 807 P.2d 1272 (1991)] and therefore not appropriate."

The profit earned by the City from the return-on-equity charge and PILOT totaled about $4 million during fiscal years 2006 through 2011. The City apparently stopped receiving the return-on-equity charge in fiscal year 2012, and it stopped receiving the PILOT funds during fiscal year 2014.

On December 9, 2011, the Building Contractors Association of Southeast Idaho filed an action against the City challenging the PILOT, and the district court ultimately held that it was an unlawful charge. On November 15, 2013, the district court entered a judgment enjoining the City "from using the PILOT fee as part of the calculation of user and/or connection fees charged to the public." When the City discontinued the PILOT component in the bills sent to users of the City water and sewer systems, their monthly bills decreased by about ten percent.[1]

---

[1] Ironically, over 100 years ago, the City sued the owner of the water system that supplied water to the City, contending that the rates being charged were "not fair, equitable, or reasonable" and that the earnings of the water system should not exceed "five per cent above reasonable expenses upon the value of said water system." *City of Pocatello v. Murray*, 21 Idaho 180, 188, 191, 120 P. 812, 815 (1912). The City sought a writ of mandate requiring the owner of the water system to appoint two commissioners in conformity with Idaho Revised Codes section 2839 (1908). *Id*. at 188, 120 P. at 814. Under the statute, the town and the owner of the water system each selected two commissioners, who then selected a fifth commissioner, and the majority of the commissioners then determined the water rates to apply for the next three years. This Court ordered that the writ issue. *Id*. at 211, 120 P. at 822–23.

This shows that the City was operating its water and sewer "primarily as a source of revenue to the city," in violation of Idaho Code section 50-1028. The City made the decision that its water and sewer departments should be operated as for-profit corporations in order to raise revenues for the City's general fund. The ten percent increase in monthly bills means that the City was earning a profit of ten percent above the amount that was necessary to ensure that its water and sewer systems would always remain self-supporting. That profit went into the general fund, not into any reserves for the maintenance and improvement of the water and sewer systems. Indeed, the rationale for the "rate of return" and the PILOT was the profit that the City would earn if its water and sewer systems were for-profit entitities.

On April 15, 2014, the Plaintiffs filed this action seeking a refund of the PILOT sums that they had paid. They also sought class certification for those who had been charged and paid the illegal sum. On cross-motions for summary judgment, the district court held that the Plaintiffs' state law claims were barred under the Idaho Tort Claims Act, that there was no unconstitutional taking under the Fourteenth Amendment to the Constitution of the United States, that the decision in the *Building Contractors* case would not be applied retroactively, and that the Plaintiffs' motion for class certification was denied. The court entered a judgment dismissing the Plaintiffs' complaint, and they timely appealed.

When reviewing on appeal the granting of a motion for summary judgment, we apply the same standard used by the trial court in ruling on the motion. *Infanger v. City of Salmon*, 137 Idaho 45, 46–47, 44 P.3d 1100, 1101–02 (2002). We construe all disputed facts, and draw all reasonable inferences from the record, in favor of the non-moving party. *Id*. at 47, 44 P.3d at 1102. Summary judgment is appropriate only if the evidence in the record and any admissions show that there is no genuine issue of any material fact regarding the issues raised in the pleadings and that the moving party is entitled to judgment as a matter of law. *Id*. If the evidence reveals no disputed issues of material fact, then only a question of law remains, over which this Court exercises free review. *Id*. In this case, there is no dispute regarding the material facts.

## II.

## Did the District Court Err in Holding that Recovery of the PILOT Was Barred by Idaho Code Section 6-904A?

4

Idaho Code section 6-904A states, insofar as is relevant:

> A governmental entity and its employees while acting within the course and scope of their employment and without malice or criminal intent and without reckless, willful and wanton conduct as defined in section 6-904C, Idaho Code, shall not be liable for any claim which:
> 1. Arises out of the assessment or collection of any tax or fee.

The district court held that all of the Plaintiffs' state-law claims were barred because their "state law claims—unconstitutional taking, unjust enrichment, and equitable estoppel/equitable tolling—arise out of the collection of the PILOT component, which was found to be a tax." In so holding, the district court erred.

"A municipality may collect fees considered incidental to regulation and enacted pursuant to the municipality's police powers." *Lewiston Indep. Sch. Dist. No. 1 v. City of Lewiston*, 151 Idaho 800, 804–05, 264 P.3d 907, 911–12 (2011). Pursuant to its proprietary function, municipalities may also construct and maintain public works, *Viking Const., Inc. v. Hayden Lake Irr. Dist.*, 149 Idaho 187, 193, 233 P.3d 118, 124 (2010), and charge a fee "for a direct public service rendered to the particular consumer," *Brewster v. City of Pocatello*, 115 Idaho 502, 505, 768 P.2d 765, 768 (1988). Finally, a municipality may assess and collect taxes if authorized by the legislature. *Id.* at 504, 768 P.2d at 767; Idaho Const. art. VII, § 2.

For a fee to be considered incidental to regulation, "funds generated thereby must bear some reasonable relationship to the cost of enforcing the regulation." *Brewster*, 115 at 504, 768 P.2d at 767. "Such municipal fees must be rationally related to the cost of enforcing the regulation and cannot be assessed purely as a revenue-generating scheme." *Potts Constr. Co. v. N. Kootenai Water Dist.*, 141 Idaho 678, 681, 116 P.3d 8, 11 (2005). The power to impose a regulatory fee "may not be resorted to as a shield or subterfuge, under which to enact and enforce a revenue-raising ordinance or statute." *Foster's, Inc., v. Boise City*, 63 Idaho 201, 218–19, 118 P.2d 721, 728 (1941). If the regulatory fee does not bear a reasonable relationship to the cost of enforcing a regulation, it is considered as being a tax. *Brewster*, 115 at 504–05, 768 P.2d at 767–68.

For a fee to be for water and sewer services provided by the municipality that is subject to the Revenue Bond Act, as in this case, "the services of such works shall be furnished at the lowest possible cost." I.C. § 50-1028. "[I]f fees are collected under the disguise of the [Revenue Bond] Act and allocated and spent otherwise, then the fees are primarily revenue raising and will

be construed as taxes." *Loomis v. City of Hailey*, 119 Idaho 434, 439, 807 P.2d 1272, 1277 (1991). "In a general sense a fee is a charge for a direct public service rendered to the particular consumer, while a tax is a forced contribution by the public at large to meet public needs." *Brewster*, 115 at 505, 768 P.2d at 768.

In both of the above instances, the fee is considered to be a tax because its purpose is primarily to raise revenue. "[I]f the fee or charge is imposed primarily for revenue raising purposes, it is in essence a tax and can only be upheld under the power of taxation." *Idaho Bldg. Contractors Ass'n v. City of Coeur d'Alene*, 126 Idaho 740, 743, 890 P.2d 326, 329 (1995). A fee or charge primarily for raising revenue is "*in essence* a tax," *id.* (emphasis added); "a *disguised* tax," *Lewiston Indep. Sch. Dist.*, 151 Idaho at 801, 264 P.3d at 912 (emphasis added); or it "*operates* as general tax on the public," *Potts Constr. Co.*, 141 Idaho at 681, 116 P.3d at 11 (emphasis added). That classification is part of the analysis in determining whether the fee or charge is lawful. If its purpose is primarily to raise revenue, it is not a regulatory fee or fee for services, but is characterized as a tax. It would then only be valid if the city was authorized to impose such a tax. *See State v. Nelson*, 36 Idaho 713, 722, 213 P. 358, 361 (1923) *overruled on other grounds by*, *Greater Boise Auditorium Dist. v. Royal Inn of Boise*, 106 Idaho 884, 888, 684 P.2d 286, 290 (1984) ("A license that is imposed for revenue is not a police regulation, but a tax, and can only be upheld under the power of taxation."); *Brewster v. City of Pocatello*, 115 Idaho 502, 503, 768 P.2d 765, 766 (1988) ("There is no argument here that our legislature has authorized the imposition of such a tax if indeed it is denominated a tax.").

However, although fees or charges that are imposed primarily to raise revenues may be considered as being a tax or in essence a tax, such fees or charges are not actually taxes, because the legislature must invest in any county, city, town, or other municipal corporation "the power to assess and collect taxes for all purposes of such corporation." Idaho Const. art. VII, § 6. "[T]he grant of taxing power to cities is not self-executing or unlimited. It is limited by what taxing power the legislature authorizes in its implementing legislation." *Brewster*, 115 Idaho at 503, 768 P.2d at 766. "A city or village cannot, in the exercise of its police power, levy taxes." *Nelson*, 36 Idaho at 722, 213 P. at 361. If the legislature has not granted a city the power to impose a fee or charge as a tax, then such fee or charge is not actually a tax. There is no contention that the legislature authorized the City to impose a tax like the charges that it added to

6

the bills of users of the City's water and sewer systems. Because those charges were not an authorized tax, they were not a tax as that term is used in Idaho Code section 6-904A.

In *BHA Investments, Inc. v. City of Boise*, 141 Idaho 168, 108 P.3d 315 (2004), we held that the fee versus tax analysis does not apply when a city does not have the authority to impose either the fee or a tax. In *BHA Investments*, an entity referred to as "Splitting Kings" leased a liquor license and agreed in the lease agreement to pay the liquor license transfer fee charged by the City of Boise. *Id.* at 171, 108 P.3d at 318. Later, Splitting Kings and its lessor's successor, "Bravo," sued Boise to recover damages for wrongful taking and unjust enrichment based upon the exaction of the transfer fee. *Id.* The district court granted summary judgment to Boise on three grounds, one of which was that "the fee charged by the City was a disguised tax and a party cannot obtain reimbursement of a tax unless it is paid 'under protest.'" *Id.* We held that the analysis of whether the money collected was an unreasonable fee or a disguised tax had no bearing where the city did not have the authority to impose either the fee or a tax. We stated:

> We have also held that a city's imposition of a purported fee that does not bear a reasonable relationship to services to be provided by the city is in reality the imposition of a tax. . . . .
>
> *The purpose of the analysis regarding excessive fees is to prevent a city from imposing an illegal tax by masquerading it as a fee. That analysis does not apply, however, where the city does not have the authority to impose either the tax or the fee.* If it has no authority to impose any fee at all, it does not matter whether the fee imposed bears a reasonable relationship to the services provided. It is illegal regardless of the amount of the fee. In this case, the City did not have the authority to impose either a fee for the transfer of a liquor license or a tax on the transfer of a liquor license. Therefore, the analysis of whether liquor license transfer fee was in reality a disguised tax does not apply.

*Id.* at 176, 108 P.3d at 323 (citation omitted) (emphasis added). We also held that where Boise "denominated the sum owing as a 'fee,' the payment-of-tax-under-protest requirement does not apply." *Id.* In this case, the City did not have the authority to add either the fee (PILOT) or a tax to the bills of those who used City the water or sewer systems. The City also did not denominate the additional charges as taxes. In fact, it raised the rates for water and sewer service so that it would not have to take the politically unpopular route of raising property taxes.

"'Whenever an act of the Legislature can be so construed and applied as to avoid conflict with the Constitution and give it the force of law, such construction will be adopted by the courts.'" *Grice v. Clearwater Timber Co.*, 20 Idaho 70, 77, 117 P. 112, 114 (1911). As

quoted above, Idaho Code section 6-904A provides that a governmental entity is not liable for a claim that arises out of the assessment or collection of a tax unless the governmental entity was acting with "malice or criminal intent and with[] reckless, willful and wanton conduct as defined in section 6-904C." The Idaho Constitution provides, "Private property may be taken for public use, but not until a just compensation, to be ascertained in the manner prescribed by law, shall be paid therefor." Idaho Const. art. I, § 14. To hold that an unlawful fee or charge is a "tax" as that term is used in section 6-904C would create a conflict between the statute and the Constitution. A statute cannot limit the right to recover for the taking of property in violation of the Constitution.

## III.

### Did the District Court Err in Holding that Money Is Not Property under the Takings Clause of the Constitution?

The Plaintiffs alleged in their complaint that the unlawful additional charge for water and sewer service was a taking under the Idaho and United States Constitutions. In granting summary judgment, the district court held that the imposition of the PILOT was not a compensable taking. It appeared to rely upon three grounds for that decision: (1) "Some courts have made that determination on the grounds that money is not 'property' within the meaning of the Takings Clause," and (2) "Other courts 'have concluded that a governmental-imposed obligations to pay money are not the sort of governmental actions subject to a takings analysis.'" (Citations omitted.) Both of these rationales are incorrect.

First, it is clear that money is property within the meaning of the takings clause. The Supreme Court of the United States so held in *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155 (1980). In that case, the purchaser of the assets of a corporation, whose debts appeared greater than the purchase price, filed an interpleader action interpleading as defendants the corporation and its creditors and paid into court the amount of the purchase price. *Id*. at 156–57. Pursuant to a statute, the court clerk deducted a fee for services rendered for receiving the money into the registry of the court and deposited the balance of the money into an interest bearing account. *Id*. at 157. About a year later, a receiver was appointed for the corporation, and the principal balance in the account was paid to the receiver, but the interest earned was retained by the clerk pursuant to another statute which declared that the interest earned was public money.

8

*Id.* at 158. The receiver obtained a court order holding that the clerk was not entitled to the interest earned, and on appeal the Supreme Court of Florida held "that a fund so deposited is 'considered "public money"'" from the date of deposit until it leaves the account; that 'the statute takes only what it creates'; and that '[t]here is no unconstitutional taking because interest earned on the clerk of the circuit court's registry account is not private property.'" *Id.* at 158–59. The United States Supreme Court reversed, because "[i]t is obvious that the interest was not a fee for services" because the sum deducted by the clerk was for services rendered and "the exaction is a forced contribution to general governmental revenues, and it is not reasonably related to the costs of using the courts." *Id.* at 162–163. Therefore, "the interest earned on the interpleader fund while it was in the registry of the court was a taking violative of the Fifth and Fourteenth Amendments." *Id.* at 164–65. Likewise, in *BHA Investments, Inc. v. City of Boise*, 141 Idaho 168, 172, 108 P.3d 315, 319 (2004), we held, "Money is clearly property that may not be taken for public use without the payment of just compensation." Thus, the district court erred in holding that money is not property under the Takings Clause.

Second, the cases cited by the district court regarding a governmental-imposed obligation to pay money are inapposite. The issue in *Commonwealth Edison Co. v. United States*, 46 Fed. Cl. 29 (2000) *aff'd*, 271 F.3d 1327 (Fed. Cir. 2001), was the constitutionality of legislation "which imposes special monetary assessments on domestic utilities for the remediation of environmentally contaminated uranium processing facilities owned by the United States." *Id.* at 1329. The issue in *Branch v. United States*, 69 F.3d 1571, 1576–77 (Fed.Cir. 1995), *cert. denied*, 519 U.S. 810 (1996), was whether a statute changing corporate liability for acts of sister corporations constituted a taking. The statute at issue provided "that when a bank failure causes a loss to the federal Bank Insurance Fund, sister banks that are owned by the same bank holding company may be held liable for the loss." *Id.* at 1573. In *Meriden Trust & Safe Deposit Co. v. F.D.I.C.*, 62 F.3d 449 (2d Cir. 1995), there was no taking where a bank voluntarily subjected itself to a known obligation created by a failure of a commonly owned bank. *Id.* at 455. In *Commercial Builders of Northern California v. City of Sacramento*, 941 F.2d 872 (9th Cir. 1991), the court held that an ordinance that "conditions certain types of nonresidential building permits upon the payment of a fee intended to offset the burdens on the city caused by low-income workers who move there to fill jobs created by the project in question" does not constitute an unconstitutional taking where "the city had adequately supported its contribution

9

requirement by showing a sufficient nexus between nonresidential development and the demand for low-income housing." *Id*. at 873. In *United States Shoe Corp. v. United States*, 296 F.3d 1378 (Fed. Cir. 2002), a harbor tax had been held unconstitutional as a violation of the Export Clause of the Constitution, which states, "No Tax or Duty shall be laid on Articles exported from any State." On appeal to the United States Supreme Court, the government attempted to uphold the tax as a user fee, but the Court held that "the tax, which is imposed on an ad valorem basis, is not a fair approximation of services, facilities, or benefits furnished to the exporters, and therefore does not qualify as a permissible user fee." *United States v. U.S. Shoe Corp.*, 523 U.S. 360, 363 (1998). The Shoe Corporation received a refund of the tax, and the Court of International Trade awarded it interest on the refund. 296 F.3d at 1381. The government appealed to the Federal Circuit, which addressed the Shoe Corporation's arguments in support of the award of interest, one of which was that the harbor tax was a taking in violation of the Fifth Amendment. The court held it was not a taking because the amount of the tax was not excessive when compared to the exporter's use of port services. "Because 'the Takings Clause is less restrictive than the Export Clause,' and the tax [of 0.125 percent] would be sustained if it 'fairly match[ed] the exporters' use of port services and facilities,' we conclude that the tax did not rise to the level of a taking." *Id*. at 1383–84. None of these cases involved a government entity inflating its user fees to the point that they are clearly excessive when compared to the services provided in order to raise revenue for the entity's general fund.

More instructive is the decision of the United States Supreme Court in *United States v. Sperry Corp.*, 493 U.S. 52 (1989). After the seizure of the United States Embassy in Tehran on November 4, 1979, the governments of the United States and Iran reached accords to provide a means for resolving claims by American companies against Iran. *Id*. at 55. Pursuant to the agreement, a tribunal was created to hear the claims, and litigation by Americans against Iran was precluded in American courts. *Id*. at 55–56. Sperry Corporation and Sperry World Trade, Inc. (hereinafter "Sperry"), had filed suit against Iran prior to the creation of the tribunal, but it was prohibited from pursuing that claim. *Id*. at 56. Sperry therefore filed its claim with the tribunal, and Sperry and Iran reached an agreement requiring Iran to pay Sperry $2.8 million. *Id*. They submitted the claim to the tribunal, and, upon the tribunal granting the claim, it became final and binding and enforceable in the courts of any nation in accordance with that nation's laws. *Id*. at 56–57. That enabled Sperry to have its claim paid from $1 billion in Iranian assets

10

that had been placed in a Security Account in the Bank of England for the payment of those awards. *Id*. at 57. Sperry's award was paid through the Federal Reserve Bank of New York, and Congress enacted legislation ("Section 502") requiring the bank to deduct 1½% from Sperry's award "as reimbursement to the United States Government for expenses incurred in connection with the arbitration of claims of United States claimants against Iran before [the] Tribunal and the maintenance of the Security Account established pursuant to the [Accords]." *Id*. at 58. Sperry sued, contending that the deduction constituted, among other things, the taking of property by the government without just compensation. *Id*. The court of claims rejected Sperry's claim, but the Federal Circuit reversed, holding that the deduction was an unconstitutional taking of Sperry's private property without just compensation, and the Government appealed. *Id*.

The Supreme Court held that the plaintiff was required to show that the amount of the deduction was not a user fee to reimburse the United States Government for expenses it incurred in connection with the arbitration of the claims against Iran in order to prove it was a taking. The Court stated:

> Section 502(a) specifically states that the deductions are made as "reimbursement to the United States Government for expenses incurred in connection with the arbitration of claims of United States claimants against Iran before [the] Tribunal and the maintenance of the Security Account . . . ." Given especially this specific declaration by Congress that the deductions are intended to reimburse costs incurred by the United States, the burden must lie with Sperry to demonstrate that the reality of § 502 belies its express language before we conclude that the deductions are actually takings.

*Id*. at 60.

The Court then held that the amount deducted was not so clearly excessive as to show that it was not a user fee. "This Court has never held that the amount of a user fee must be precisely calibrated to the use that a party makes of Government services. . . . All that we have required is that the user fee be a 'fair approximation of the cost of benefits supplied.'" *Id*. The Court stated that "[t]he deductions authorized by § 502 are not so clearly excessive as to belie their purported character as user fees. . . . . [F]or we are convinced that on the facts of this case, 1½% does not qualify as a 'taking' by any standard of excessiveness." *Id*. at 62. The Court concluded that the benefits available to Sperry through the tribunal were "sufficient benefits to justify the imposition of a reasonable user fee." *Id*. at 64.

11

In rejecting the claim that the deduction constituted a taking, the Court stated that "a reasonable user fee is not a taking if it is imposed for the reimbursement of the cost of government services." *Id*. at 63. The Court did not hold that there was no taking because money is not subject to the Takings Clause, nor did it hold that a user fee cannot be subject to the Takings Clause. Rather, the Court held that a reasonable user fee is not a taking if it was to reimburse the cost of government services. That proviso would be meaningless, as would the Court's discussion about the reasonableness of the fee in relation to the services provided, unless the converse was also true—a "user fee" is a taking if it is not a reasonable fee imposed for the reimbursement of the costs of government services.

The PILOT was not a reasonable user fee to reimburse the City for the cost of government services. It was an exaction that was designed to be in addition to what would be a reasonable charge for the water and sewer systems to remain self-supporting. In the *Building Contractors* case, the City conceded that fact.

In denying the Plaintiffs' motion for reconsideration in this case, the district court also held that the PILOT was not a taking because: "In this case the City clearly had the authority to charge the fees, but to the extent it used those fees for improper purposes, that portion of the fee was a disguised tax and could not be collected. This is not a constitutional 'taking' but an improper method of raising revenue." The district court did not cite any authority for this proposition. If an "improper method of raising revenue" cannot constitute a taking, then money cannot be subject to the Takings Clause because all money received by the government is revenue. Revenue is simply "the income of a government from taxation, excise duties, customs, or other sources, appropriated to the payment of the public expenses." http://www.dictionary.com/browse/revenue?s=t (accessed July 17, 2017).

**IV.**

**Did the District Court Err in Holding that Its Conclusion that the PILOT Was Unlawful Would Not Be Applied to this Case?**

The district court held that it would not apply its decision in the *Building Contractors* case to this case, and so it dismissed the Plaintiffs' complaint with prejudice. In so holding, the court applied this Court's analysis in *BHA Investments, Inc. v. City of Boise*, 141 Idaho 168, 108 P.3d 315 (2004) (*BHA II*). In a prior appeal (*BHA I*), we had held that a liquor license transfer

fee imposed by the City of Boise was not authorized by the legislature. *Id*. at 170, 108 P.3d at 317. After our opinion in *BHA I*, the case of *Bravo Entertainment, L.L.C. v. City of Boise* was brought seeking to recover the liquor license transfer fee paid by a party in that case, and the trial court held that our opinion in *BHA I* should not apply retroactively to the *Bravo Entertainment* case.

On appeal, we did not address whether the district court abused its discretion in refusing to apply our *BHA I* opinion to the *Bravo Entertainment* case. Rather, we stated:

> The usual rule is that decisions of this Court apply retroactively to all past and pending cases. For policy reasons, however, *this Court has discretion* to limit the retroactive application of a particular decision. *We may hold* that it does not apply even to the case in which the decision was announced; or that it applies only to that case and not to other past or pending cases; or that it applies to both that case and pending cases, but not to past cases. When deciding whether to limit the retroactive application of a decision, *we weigh three factors*: (1) the purpose of the decision; (2) the reliance upon the prior law; and (3) the effect upon the administration of justice if the decision is applied retroactively. *We balance* the first factor against the other two to determine whether to limit the retroactive application of the decision.

*Id*. at 173, 108 P.3d at 320 (emphases added)(Citations omitted). In the above-quoted statement from *BHA I*, we made it clear that it is this Court sitting in its appellate capacity that has discretion to limit the retroactive application of a particular decision. That is exactly what happened in *BHA II*. We did not even address the trial court's determination or rationale for holding that *BHA I* would not be applied retroactively. We addressed the three factors, weighed them, and concluded that the retroactive application of our decision in *BHA I* should not be limited. *Id*. We have not held that a trial court has discretion to refuse to apply a decision it made on an issue in one case to another case involving the same issue. Therefore, the district court erred in holding that it would not apply its decision in the *Building Contractors* case to this case.

## V.

### Did the District Court Err in Failing to Consider Equitable Remedies?

The Plaintiffs contend that the district court erred in failing to consider equitable remedies. Since the district court granted the City's motion for summary judgment on all claims, the court did not consider any remedies. "This Court does not review an alleged error on appeal

unless the record discloses an adverse ruling forming the basis for the assignment of error." *Ada Cnty. Highway Dist. v. Total Success Investments, LLC*, 145 Idaho 360, 368, 179 P.3d 323, 331 (2008). Therefore, we will not consider this issue.

The Plaintiffs also assert that they attempted to amend their complaint, which motion the district court denied. The district court denied the motion on various grounds—"undue delay, timeliness, court-imposed deadlines, substantial work being done, prejudice, and validity of the claim." The Plaintiffs do not address any of those grounds on appeal, much less all of them. Therefore, to the extent that the Plaintiffs are contending that the court erred in denying their motion to amend, we will not address that issue. "We will not consider assignments of error not supported by argument and authority in the opening brief." *Hogg v. Wolske*, 142 Idaho 549, 559, 130 P.3d 1087, 1097 (2006).

## VI.

### Is the City Entitled to an Award of Attorney Fees on Appeal?

The City seeks an award of attorney fees on appeal pursuant to Idaho Code sections 6-918A and 12-117. Idaho Code section 6-918A provides:

> At the time and in the manner provided for fixing costs in civil actions, and at the discretion of the trial court, appropriate and reasonable attorney fees may be awarded to the claimant, the governmental entity or the employee of such governmental entity, as costs, in actions under this act, upon petition therefor and a showing, by clear and convincing evidence, that the party against whom or which such award is sought was guilty of bad faith in the commencement, conduct, maintenance or defense of the action. . . . . The right to recover attorney fees in legal actions for money damages that come within the purview of this act shall be governed exclusively by the provisions of this act and not by any other statute or rule of court, except as may be hereafter expressly and specifically provided or authorized by duly enacted statute of the state of Idaho.

The statute provides that if, "upon a showing, by clear and convincing evidence, that the party against whom or which such award is sought was guilty of bad faith in the commencement, conduct, maintenance or defense of the action," reasonable attorney fees may be awarded as costs "at the discretion of the trial court." In *Minich v. Gem State Developers, Inc.*, 99 Idaho 911, 591 P.2d 1078 (1979), this Court held that the word "judge" in Idaho Code section 12-121 "is simply an officer or member of a tribunal assembled under authority of law for the administration of justice, we conclude that the singular 'judge' should also be construed to mean

14

the plural 'judges' or 'justices,'" thereby authorizing the award of attorney fees on appeal under that statute. *Id*. at 918, 591 P.2d at 1085. We also stated that "had the legislature intended to limit the statutory authority to any particular level of courts within the judicial system, it could easily and clearly have done so." *Id*.

Idaho Code section 6-918A clearly states that upon the proper showing, attorney fees may be awarded under that statute "at the discretion of the trial court." The words "trial court" could not reasonably be construed to include an appellate court. Therefore, Idaho Code section 6-918A does not provide for the awarding of attorney fees on appeal.

This Court has never previously addressed the meaning of the words "trial court" in section 6-918A. We have previously denied requests for an award of attorney fees on appeal pursuant to the statute because there was no showing that the party against whom attorney fees was sought was "guilty of bad faith in the commencement, conduct, maintenance or defense of the action." We have not, however, previously addressed the meaning of the words "trial court" in the statute, nor have we even quoted that part of the statute that includes those words." *CNW, LLC v. New Sweden Irrigation Dist.*, 161 Idaho 89, 93 n.1, 383 P.3d 1259, 1263 n.1 (2016); *Hennefer v. Blaine Cnty. Sch. Dist.*, 158 Idaho 242, 261–62, 346 P.3d 259, 278–79 (2015); *Block v. City of Lewiston*, 156 Idaho 484, 490, 328 P.3d 464, 470 (2014); *Hoffer v. City of Boise*, 151 Idaho 400, 403, 257 P.3d 1226, 1229 (2011); *Renzo v. Idaho State Dep't of Agr.*, 149 Idaho 777, 781, 241 P.3d 950, 954 (2010); *Cordova v. Bonneville Cnty. Joint Sch. Dist. No. 93*, 144 Idaho 637, 642–43, 167 P.3d 774, 779–80 (2007); *Dorea Enterprises, Inc. v. City of Blackfoot*, 144 Idaho 422, 426, 163 P.3d 211, 215 (2007); *Nation v. State, Dep't of Correction*, 144 Idaho 177, 194, 158 P.3d 953, 970 (2007); *O'Guin v. Bingham Cnty.*, 142 Idaho 49, 55–56, 122 P.3d 308, 314–15 (2005); *Jensen v. State*, 139 Idaho 57, 64–65, 72 P.3d 897, 904–05 (2003); *Tomich v. City of Pocatello*, 127 Idaho 394, 400, 901 P.2d 501, 507 (1995).

In *Block*, we did cite *Beehler v. Fremont County*, 145 Idaho 656, 182 P.3d 713 (Ct. App. 2008), but it was for the proposition, "(holding I.C. § 12-117 did not provide an exception after noting it has held that 'I.C. § 6-918A governed to the exclusion of all other standards when the case was brought under the ITCA')." 156 Idaho at 490, 328 P.3d at 470. In *Beehler*, the issue was whether the requirement in Idaho Code section 6-610 of posting a bond before filing an action against any law enforcement officer that arises in the course of performance of the officer's duty was superseded by the later enactment of Idaho Code section 6-918A. 145 Idaho

at 658, 182 P.3d at 715. The appellant contended that section 6-918A superseded section 6-610 because both statutes address attorney fees. *Id*. at 659, 182 P.3d at 716. The Court of Appeals held that "[t]here is no indication that the legislature intended I.C. § 6-918A to terminate the applicability of I.C. § 6-610 in tort claims." *Id*.

With respect to the respondents' request for an award of attorney fees on appeal in *Beehler*, the Court of Appeals held that they had not shown by clear and convincing evidence that the appellants had proceeded in bad faith. *Id*. at 661, 182 P.3d at 718. The Court of Appeals did state, "Section 6–918A is the exclusive provision for awarding attorney fees under the ITCA, including claims on appeal." *Id*. at 661, 182 P.3d at 718. However, the Court of Appeals did not quote or consider that portion of the statute stating that attorney fees may be awarded "at the discretion of the trial court." Rather, it cited as authority for that statement *Nation v. State*, 144 Idaho 177, 194, 158 P.3d 953, 970 (2007); *Jensen v. State*, 139 Idaho 57, 64–65, 72 P.3d 897, 904–05 (2003); and *Packard v. Joint Sch. Dist. No. 171*, 104 Idaho 604, 614, 661 P.2d 770, 780 (Ct.App.1983). In *Nation* and *Jensen*, we had simply denied requests to award attorney fees on appeal pursuant to Idaho Code section 6-918A on the ground that there was no showing that the appeal had been brought in bad faith. *Nation*, 144 Idaho at 194, 158 P.3d at 970; *Jensen*, 139 Idaho at 64–65, 72 P.3d at 904–05. In those cases we did not quote or discuss that part of section 6-918A that referred to the "trial court." In *Packard*, the Court of Appeals held: "*Assuming, without deciding,* that neither party would be entitled to recover attorney fees on appeal unless the opposing party had exhibited 'bad faith' within the meaning of I.C. § 6–918A, we believe no award could be made. This appeal has been free of bad faith." 104 Idaho at 614, 661 P.2d at 780. (Emphasis added). We have never previously addressed the issue of the scope of section 6-918A in light of the words "trial court," not only regarding whether the statute permitted the award of attorney fees on appeal, but also with respect to what impact, if any, those words would have on the exclusivity provision in the statute.

The City also seeks an award of attorney fees pursuant to Idaho Code section 12-121. "In order to be eligible for an award of attorney fees under Idaho Code section 12-121, the party must be the prevailing party on appeal." *Armand v. Opportunity Mgmt. Co., Inc*., 155 Idaho 592, 602, 315 P.3d 245, 255 (2013). Thus, the City is not entitled to an award of attorney fees on appeal, assuming that it would apply. Because the issue is not raised in this appeal, we do not decide whether the exclusivity provision in section 6-918A only applies to the awarding of

16

attorney fees in the trial court or also prevents the awarding of attorney fees on appeal pursuant to another statute.

## VI.

### Conclusion.

We vacate the judgment and amended judgments in this action and remand this case for further proceedings that are consistent with this opinion. We award the Appellants costs on appeal.

Chief Justice BURDICK, and Justices JONES, HORTON and BRODY **CONCUR.**